PUBLISH

UNITED STATES COURT OF APPEALS

Filed 4/12/96

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

v.

SOUPHAPHONE LANG and
DOUANGMALA LANG,

     Defendants-Appellants.

No. 95-3260, 95-3261

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. Nos. 94-CR-10121-01 and 02)

---

T. Lynn Ward, Hershberger, Patterson, Jones & Roth, L.C., Wichita, Kansas, for Defendant-Appellant Souphaphone Lang.

Ron W. Paschal, Wichita, Kansas, for Defendant-Appellant Douangmala Lang.

David M. Lind (Jackie N. Williams, United States Attorney, with him on the brief), Assistant United States Attorney, Wichita, Kansas, for Plaintiff-Appellee.

---

Before **PORFILIO, KELLY,** and **BRISCOE**, Circuit Judges.

---

**PORFILIO**, Circuit Judge.

---

Souphaphone and Douangmala Lang were convicted after a jury trial of possession with the intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), carrying or using a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c), and aiding and abetting each other's criminal conduct in violation of 18 U.S.C. § 2. On appeal, Souphaphone and Douangmala Lang raise three common issues. The Langs challenge the sufficiency of the evidence supporting their firearm convictions, the district court's denial of their joint motion to suppress, and the two-level enhancement each received in their sentences for obstruction of justice. We reverse both Souphaphone and Douangmala Lang's 18 U.S.C. § 924(c) convictions, but remand for resentencing for the district court to determine the applicability of the two-level special offense characteristic enhancement of U.S.S.G. § 2D1.1(b)(1) to the facts of this case. We affirm the district court's denial of the Langs' joint motion to suppress, and also affirm the two-level enhancement for obstruction of justice imposed against both defendants pursuant to U.S.S.G. § 3C1.1.[1]

I.

---

[1] Although filed separately, these cases are joined only for the purpose of their disposition.

Souphaphone and Douangmala Lang were arrested as a result of the FBI's Violent Crime Task Force's surveillance of a mobile home in Wichita, Kansas, on November 29, 1994. The Task Force conducted the surveillance because they believed Fongyxmany Phommachanh was staying at the mobile home. The Task Force began its surveillance at 9:18 a.m. on November 29. The surveillance team consisted of five agents distributed among four different vehicles. FBI Special Agent Daniel Jablonski led the surveillance from one vehicle, with Detective Mitchell Mervosh and Officer Blake E. Mumma riding together in a second vehicle, FBI Special Agent Charles G. Pritchett in a third vehicle, and Detective Danny Parker in a fourth vehicle. The impetus for the surveillance of the mobile home was the Task Force's belief Mr. Phommachanh could be located there. The Task Force possessed information the mobile home was a frequent gathering place or hangout for Asian gang members with whom Mr. Phommachanh was associated. Mr. Phommachanh was wanted for questioning in connection with three armed robberies occurring in the Wichita metropolitan area between September and November 1994.

First, the Task Force believed Mr. Phommachanh was involved in the September 22, 1994 armed robbery at a Sonic Drive-In restaurant where he had once worked. Two Asian men wearing ski masks had entered the restaurant, discharged a firearm, and robbed the cash register. The Task Force concluded a former employee was involved

because the details of the crime suggested some insider knowledge. A witness, a Sonic employee who had previously worked with Mr. Phommachanh, identified him as one of the two perpetrators based on his voice and mannerisms.

Second, Mr. Phommachanh was also a suspect in another robbery at a different Sonic Drive-In restaurant on October 12, 1994. The methods employed by the robbers were similar to those used in the first offense. Again, two Asian men with their faces disguised by ski masks entered the establishment, threatened the employees by discharging a firearm, and fled with the cash from the register. In addition, ballistics revealed the same .32 caliber gun was used to commit both robberies.

Third, the Task Force sought to question Mr. Phommachanh about the November 8, 1994 robbery of the Mandarin Restaurant during which one of its proprietors, Barbara Sun, was murdered. Three or four armed Asian males perpetrated the third robbery. The Task Force's information concerning Mr. Phommachanh's possible participation in the Mandarin Restaurant robbery came from his mother, Kanha Pommachanh. Mrs. Pommachanh was working at Wesley Hospital as a housekeeper when Barbara Sun was brought there. Mrs. Pommachanh overheard several people talking about the Mandarin robbery, Ms. Sun's murder, and how four Asian males were suspects. She feared her son might be involved. Mrs. Phommachanh reached this conclusion because her son had left home between two and three

- 4 -

months previously and she had not seen him since. She also believed her son might be involved with a gang and feared the Mandarin Restaurant robbery/murder was part of a gang war.

Mrs. Phommachanh contacted the police, and Detective Mervosh interviewed her at the hospital on November 14. Following the interview at the hospital, Mr. Phommachanh telephoned his mother and asked her for $400 to assist in moving either his friend's car or trailer. Mrs. Phommachanh called Brad Cary, a member of the gang unit of the Wichita Police Department, whom she knew from her work at the hospital. Mrs. Phommachanh told Officer Cary of her son's request for money. He suggested Mr. Phommachanh might use the money to leave Wichita. After her phone conversation with Officer Cary, Mrs. Phommachanh determined not to give her son the $400.

Subsequently, Mrs. Phommachanh and her husband visited the Task Force office at FBI headquarters and talked to Detective Mervosh and Agent Jablonski at their request. At the office, the Phommachanhs viewed a series of pictures in an attempt to identify possible gang members, and Mrs. Phommachanh talked further of her fear of her son's involvement in criminal activity and his request for money.

Armed with this information, the Task Force began its surveillance of the mobile home hoping to find Mr. Phommachanh. The Task Force agents had a mug shot and a physical description of

Mr. Phommachanh.  All was quiet until 12:18 p.m. when a red Chevrolet S-10 Blazer arrived at the mobile home.  An unidentified Asian male left the Blazer and entered the residence.  After spending about four minutes inside, the same unidentified Asian male and another unidentified Asian male left the home, returned to the Blazer and began to drive away.

Agent Jablonski, who was between fifty and seventy yards from the mobile home, could not positively identify the man during the approximately ten seconds he could observe him on each trip between the mobile home and the Blazer.  He believed, however, the unidentified male who got into the passenger seat of the Blazer was their suspect, Mr. Phommachanh.  Consequently, he ordered the other Task Force agents to pursue the Blazer.  Agent Jablonski pulled up alongside the Blazer and attempted to visually compare the mug shot of Mr. Phommachanh, which he had in his possession, with the facial features of the vehicle's passenger.  After concluding the passenger was in fact Mr. Phommachanh, Agent Jablonski ordered the Blazer be stopped and pulled in front of the Blazer at a traffic light.  The other Task Force vehicles surrounded the Blazer to prevent its escape.  The Task Force agents had no other reason to stop the Blazer except for the fact they believed the passenger was Mr. Phommachanh.

After the Blazer was stopped, Detective Mervosh and Officer Mumma pulled in behind the vehicle.  They noticed the passenger

making frequent furtive movements at his feet either in an attempt to retrieve or hide something. Detective Mervosh moved to the driver's side of the vehicle, while Officer Mumma simultaneously proceeded to the passenger's side. Both police officers directed the Blazer's occupants to exit, face, and place their hands on the vehicle in front of them. After the suspects complied with this request, both Detective Mervosh and Officer Mumma conducted a standard pat down search for weapons. Detective Mervosh's suspect, the driver, later identified as Souphaphone Lang, had no weapons or other contraband on his person. However, Officer Mumma's pat down search of the passenger, later identified as Douangmala Lang, revealed a suspicious bulge protruding from the suspect's left front pants pocket.

Officer Mumma asked the man what was in his pants pocket, and the passenger replied, "money." Officer Mumma asked the man's permission to examine the "money" and received consent. To ensure the passenger clearly understood his question, Officer Mumma repeated his request, this time looking the passenger directly in the eyes. Again, the man gave his consent. Officer Mumma removed the rolled-up plastic bag and discovered what appeared to be cocaine inside. Contemporaneously, Officer Mumma noticed what he also believed to be cocaine in plain view on the floorboard next to the passenger's seat.

Either during or immediately following his pat down search, Officer Mumma asked the passenger his name. The suspect replied: "Joe Lang." Later, the man produced identification confirming his identity was Douangmala Lang. At this point, the Task Force agents realized they had mistaken Douangmala Lang for Fongyxmany Phommachanh. Souphaphone Lang also produced identification demonstrating his identity.

After conferring among themselves, and telephoning an Assistant United States Attorney, the Task Force agents placed both Souphaphone and Douangmala Lang under arrest based on the cocaine found on Douangmala Lang's person and in plain view in the Blazer. The agents searched the Blazer after arresting both brothers, and found two additional plastic bags of cocaine tucked underneath the passenger seat of the vehicle. Both Souphaphone and Douangmala Lang cooperated with the police and gave statements implicating themselves and Mr. Phommachanh for cocaine possession and distribution.

After obtaining these statements, along with the other evidence from the Blazer, the Task Force agents received a search warrant for the mobile home. The search warrant was executed the same day, November 29, at approximately 3:00 p.m. During their search of the premises, Task Force agents discovered a loaded .12 gauge shotgun underneath the couch in the living room, cocaine residue on a plate in the kitchen, and some additional cocaine

inside a sock in a dresser drawer in one of the mobile home's bedrooms. Eight people were inside the mobile home at that time. Mr. Phommachanh was arrested, and the other people were taken in for questioning. Mr. Phommachanh gave a statement to the police admitting giving cocaine to the Lang brothers for them to distribute, and his involvement in the two armed robberies at the Sonic Drive-In restaurants.

Initially, Souphaphone and Douangmala Lang were indicted along with Mr. Phommachanh on the drug and firearms charges. Mr. Phommachanh was also indicted with several other defendants in a related case involving the armed robberies.[2] The district court conducted a joint hearing regarding the two related cases and heard testimony concerning Souphaphone and Douangmala Lang's motion to suppress among other issues. After the hearing, the court denied Souphaphone and Douangmala Lang's joint motion to suppress in a written memorandum and order.

The court concluded there was no evidence presented during the suppression hearing to indicate the stop was pretextual. The court held the agents stopped the Blazer for the purpose of questioning Mr. Phommachanh about the Sonic Drive-In and Mandarin robberies. Therefore, the court framed the issue as "whether the Task Force had objective justification to stop Phommachanh to question him."

---

[2] Ultimately, Mr. Phommachanh reached a plea agreement with the government and was not tried with Souphaphone and Douangmala Lang.

The court concluded the agents had a reasonable and objective belief Mr. Phommachanh was implicated in the three crimes.

The court determined the agents' misidentification of Douangmala Lang as Fongyxmany Phommachanh was also reasonable. The court rejected the argument Detective Mervosh was familiar with Souphaphone and Douangmala Lang based on his previous arrest of Souphaphone on November 17 depriving the agents of a good faith mistake of identity. The court reasoned Agent Jablonski, not Detective Mervosh, decided to stop the Blazer; therefore, Detective Mervosh's individual familiarity with Souphaphone Lang was irrelevant to this decision. Further, Detective Mervosh had not seen either Douangmala Lang or Mr. Phommachanh prior to the stop. In turn, Agent Jablonski had not seen any of the three men in question prior to the November 29 incident. The court specifically found, "the physical characteristics of Phommachanh and Douangmala are similar and the mug shot of Phommachanh available to Agent Jablonski on November 29 looks very much like Douangmala Lang."

The court concluded Officer Mumma's pat down search of Douangmala Lang was reasonable under the circumstances, and also held Douangmala Lang voluntarily consented to the search of his left front pants pocket, which resulted in the initial discovery of cocaine. The court found the agents did not improperly exceed the scope of their initial stop because everything the agents did until they could confirm Souphaphone and Douangmala Lang's identities was

- 10 -

reasonable under the circumstances. The court concluded the agents' actions were justified because of their legitimate belief the passenger of the vehicle was Mr. Phommachanh, a potentially dangerous individual wanted for questioning in two armed robberies and a robbery/murder. Finally, the court concluded the cocaine found by Officer Mumma on the passenger side floorboard of the Blazer was in plain view.

In addition, the district court twice rejected the Langs' arguments there was insufficient evidence to support their convictions for carrying or using a firearm in connection with a drug trafficking crime in violation of 18 U.S.C. § 924(c). At sentencing, the district court enhanced both Souphaphone and Douangmala Lang's sentences by two-levels pursuant to U.S.S.G. § 3C1.1 for obstruction of justice. The court specifically found both brothers committed perjury when they testified at trial.

## II.

Initially, Souphaphone and Douangmala Lang argue the government presented insufficient evidence to support their convictions under 18 U.S.C. § 924(c) for carrying or using a firearm in relation to a drug trafficking crime. The .12 gauge shotgun was discovered by the police during their search of the mobile home under the couch in the front room, and no evidence was ever offered that either Souphaphone or Douangmala Lang brandished,

held, or even touched the firearm in conjunction with any drug trafficking activities. The Langs assert the evidence arrayed against them is insufficient to support a conviction under **Bailey v. United States**, ___ U.S. ___, 116 S.Ct. 501 (1995). The government agrees the evidence was insufficient to sustain a conviction under **Bailey**, but argues the case must be remanded to the district court for resentencing so it may consider the Langs' possession of a dangerous weapon during a drug trafficking crime for the two-level enhancement available pursuant to U.S.S.G. § 2D1.1(b)(1).

We review sufficiency of evidence claims by viewing the evidence in the light most favorable to the jury's verdict. **United States v. Jones**, 49 F.3d 628, 632 (10th Cir. 1995). "The court must 'determine whether any reasonable jury could find the defendant guilty beyond a reasonable doubt.'" **Id.** (quoting **United States v. Coslet**, 987 F.2d 1493, 1495 (10th Cir. 1993)); **United States v. Richard**, 969 F.2d 849, 856 (10th Cir.), *cert. denied*, 506 U.S. 887 (1992). We make this determination on appeal by examining all the direct and circumstantial evidence contained in the record and the reasonable inferences drawn from such evidence. **United States v. Leopard**, 936 F.2d 1138, 1140 (10th Cir. 1991).

We begin our analysis by deciding whether the new rule announced in **Bailey** applies to Souphaphone and Douangmala Lang. In

*Griffith v. Kentucky*, 479 U.S. 314 (1987), the Supreme Court held, "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Id.* at 328; *see also* **Powell v. Nevada**, ___ U.S. ___, 114 S.Ct. 1280, 1283-84 (1994). Because both Souphaphone and Douangmala Lang's appeals were pending on direct review when **Bailey** was decided, and **Bailey** announced a new rule of criminal law, it applies here.

In **Bailey,** the Court attempted "to clarify the meaning of 'use' under § 924(c)(1)." **Bailey**, 116 S.Ct. at 505.[3] The Court unanimously held "§ 924(c)(1) requires evidence sufficient to show an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." *Id.* In its discussion of its new test, the Court "briefly describe[d] some of the activities that fall within 'active employment' of a firearm, and those that do not." *Id.* at 508. The Court included, "brandishing, displaying, bartering, striking with, and most obviously, firing or attempting to fire, a

---

[3] The statute also prohibits "carrying" a firearm in relation to a drug trafficking crime. The government has never alleged either Souphaphone or Douangmala Lang ever carried the shotgun in this case, so this aspect of the statute does not apply. *Compare* **United States v. Farris**, ___ F.3d ___, 1996 WL 82490, at *3 (11th Cir., March 13, 1996) (discussing what constitutes carrying a firearm for § 924(c) purposes after **Bailey**); **United States v. Riascos-Suarez**, 73 F.3d 616, 622-24 (6th Cir. 1996) (same).

firearm," *id.,* among those activities constituting active employment. In contrast, the Court concluded the "mere possession of a firearm by a drug offender, at or near the site of a drug crime or its proceeds or paraphernalia" or "the inert presence of a firearm, without more, is not enough to trigger § 924(c)(1)." *Id.* Additionally, the Court also determined the meaning of "use" excluded the situation "where an offender conceals a gun nearby to be at the ready for an imminent confrontation." *Id.* Further, besides the examples discussed by the Court, the facts of the two cases before the Court are also instructive. The Court concluded the discovery of a firearm inside a bag in one defendant's locked car trunk, and the analogous discovery of an unloaded, holstered firearm in a locked footlocker in another defendant's bedroom closet were both insufficient to demonstrate active employment under the Court's new definition. *Id.* at 509.

Since the Court decided *Bailey*, this court has only addressed the applicability of § 924(c)(1) on one occassion. *United States v. Wacker*, 72 F.3d 1453 (10th Cir. 1995). In *Wacker*, we vacated the § 924(c)(1) convictions of several defendants and remanded one defendant's case for a new trial before a jury properly instructed pursuant to *Bailey*. *Id.* at 1463-65. Firearms discovered in a bag in the rear camper shell of one defendant's truck, and in a file cabinet in another defendant's home, were held not to be actively

- 14 -

employed in the defendants' marijuana harvesting and distribution operation. *Id.* at 1460-65.

In the instant case, the .12 gauge shotgun was discovered underneath the couch in the front room of the mobile home. Souphaphone and Douangmala Lang were arrested in their Blazer several miles from the mobile home, and the Task Force agents only found the shotgun when searching the residence pursuant to a warrant after both Langs were in custody. Under these circumstances, there is no way either Lang can be said to have actively employed the shotgun in relation to any drug trafficking. The situation here is most analogous to a mere possession of a firearm near a drug site or drug paraphernalia, which the Court specifically concluded did not qualify as a "use" within the meaning of the statute. Accordingly, we hold the government failed to present sufficient evidence to convict either Souphaphone or Douangmala Lang under *Bailey's* reinterpretation of 18 U.S.C. § 924(c)(1).

However, our inquiry does not end with the conclusion sufficient evidence was not presented to support these convictions. Instead of contesting the sufficiency of evidence issue, the government argues these two cases must be remanded to the district court for resentencing so it can consider the applicability of a two-level enhancement under U.S.S.G. § 2D1.1(b)(1). We agree.

Souphaphone and Douangmala Lang were charged under § 924(c)(1); therefore, the district court was precluded from enhancing their base offense levels by two-levels pursuant to § 2D1.1(b)(1) because of the Sentencing Guidelines' prohibition on double counting. The Guidelines provide:

> 18 U.S.C. §§ 844(h), 924(c), and 929(a) provide mandatory minimum penalties for the conduct proscribed. To avoid double counting, when a sentence under this section is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for explosive or firearm discharge, use, or possession is not applied in respect to such underlying offense.

U.S.S.G. § 2K2.4 comment.(backg'd). The specific offense characteristic at issue here falls squarely within this provision. *See, e.g., **United States v. Blake***, 59 F.3d 138, 139-40 (10th Cir.) ("[A] sentencing court cannot enhance a defendant's sentence for a robbery under the Guidelines by reason of his use of a firearm if the defendant has been separately convicted and is being sentenced under § 924(c) for using the firearm in the commission of the same robbery. To do so would impermissibly double count contrary to the language and policy of the Sentencing Guidelines."), *cert. denied*, 116 S.Ct. 580 (1995). However, vacating the Langs' § 924(c) convictions pursuant to **Bailey** eliminates this prohibition.[4] We

---

[4] In **Bailey**, the Court specifically recognized U.S.S.G. § 2D1.1(b)(1) allowed an enhancement when a firearm was possessed during a drug trafficking offense, a broader category of cases than the definition of "use" adopted by the Court. **Bailey v. United States**, ___ U.S. ___, 116 S.Ct. 501, 509 (1995); *see also* **United States v. Gary**, 74 F.3d 304, 317 n. 11 (1st Cir. 1996).

have previously held this enhancement may be imposed at sentencing after a defendant has been acquitted of a § 924(c) charge. *United States v. Martinez*, 979 F.2d 1424, 1433-34 (10th Cir. 1992), *cert. denied*, 507 U.S. 1022 (1993); *United States v. Eagan*, 965 F.2d 887, 892 (10th Cir. 1992). We find no persuasive reason to treat an appellate reversal on sufficiency of evidence grounds any differently. In fact, the two circuits who have addressed this precise issue following *Bailey* have determined a remand for resentencing was appropriate. *United States v. Fennell*, ___ F.3d ___, 1996 WL 91616, at *1 (D.C. Cir., March 4, 1996) (per curiam); *United States v. Roulette*, 75 F.3d 418, 426 (8th Cir. 1996) ("The prohibition against applying the two level enhancement is no longer applicable, because the firearm sentence on Count 4 has been set aside."). Therefore, we hold when a defendant's conviction under 18 U.S.C. § 924(c) is reversed on sufficiency of evidence grounds on appeal, the case is subject to remand for resentencing to determine the applicability of the enhancement found at U.S.S.G. § 2D1.1(b)(1) to the facts of each particular case.

On remand, the district court must determine whether either Souphaphone or Douangmala Lang possessed a firearm in connection with their drug trafficking activities within the meaning of the guidelines. "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 comment. (n.3).

- 17 -

Initially, the government bears the burden of proving by a preponderance of the evidence that the gun was proximate to the drug offense. *United States v. Earls*, 42 F.3d 1321, 1326 (10th Cir. 1994), *cert. denied*, 115 S.Ct. 1800 (1995). The government must present evidence demonstrating "that a temporal and spatial relation exited beween the weapon, the drug trafficking activity, and the defendant." *United States v. Robertson*, 45 F.3d 1423, 1449 (10th Cir.), *cert. denied*, 115 S.Ct. 2558 (1995) (quoting *United States v. Roederer*, 11 F.3d 973, 982 (10th Cir. 1993)). If the government meets its burden, the onus shifts to the defendant to "show it is 'clearly improbable' that the weapon was related to the offense." *Robertson*, 45 F.3d at 1449; *United States v. Jackson*, 11 F.3d 953, 956 (10th Cir. 1993). We explicitly offer no opinion whether the enhancement is applicable here. That determination is appropriately made by the district court in the first instance on remand after a sentencing hearing. We note only the analysis of whether Souphaphone and Douangmala Lang possessed the shotgun may differ based on the individual circumstances linking the firearm to each defendant.

## III.

In addition, both Souphaphone and Douangmala Lang appeal the district court's denial of their joint motion to suppress. They argue the Task Force's actions beginning with the initial stop and

proceeding through the different searches leading to their arrest violated the Fourth Amendment and necessitated the suppression of all the resulting evidence as the fruit of a poisonous tree. We agree with the district court no Constitutional violation occurred here.

In reviewing a denial of a motion to suppress, we view the evidence in the light most favorable to the district court's ruling. *United States v. Marchant*, 55 F.3d 509, 512 (10th Cir.), *cert. denied*, 116 S.Ct. 260 (1995). The district court's factual findings underpinning the denial of the motion are accepted unless clearly erroneous. *United States v. Little*, 60 F.3d 708, 712 (10th Cir. 1995)*; United States v. Flores*, 48 F.3d 467, 468 (10th Cir.), *cert. denied*, 116 S.Ct. 122 (1995). A reviewing court must remain "mindful that at a hearing on a motion to suppress, the credibility of the witnesses and the weight given the evidence, as well as the inferences and conclusions drawn therefrom, are matters for the trial judge." *United States v. Fernandez*, 18 F.3d 874, 876 (10th Cir. 1994); *United States v. Werking*, 915 F.2d 1404, 1406 (10th Cir. 1990). However, the ultimate determination of the reasonableness under the Fourth Amendment is reviewed de novo. *Little*, 60 F.3d at 712; *Fernandez*, 18 F.3d at 876.

To begin with, Souphaphone and Douangmala Lang challenge the Task Force's initial stop of the Blazer. The Langs argue the Task

Force lacked reasonable suspicion to stop the Blazer assuming Mr. Phommachanh actually had been a passenger in the vehicle.

Our prior cases have identified three distinct types of police-citizen encounters. In **United States v. Madrid**, 30 F.3d 1269 (10th Cir.), *cert. denied*, 115 S.Ct. 527 (1994), we stated:

> The first involves the voluntary cooperation of a citizen in response to non-coercive questioning. The second is a **Terry v. Ohio**, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), stop, involving only a brief, non-intrusive detention and frisk for weapons when officers have a reasonable suspicion that the defendant has committed a crime or is about to do so. The third encounter is the arrest of the defendant.

*Id.* at 1275 (citing **United States v. Griffin**, 7 F.3d 1512, 1516 (10th Cir. 1993)). This case falls within the second category and must be evaluated under **Terry**. In that decision, the Court concluded, to justify "the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences drawn from those facts, reasonably warrant that intrusion." **Terry**, 392 U.S. at 21. The Court cautioned, however, a police officer was not entitled to rely on "his inchoate and unparticularized suspicion or 'hunch'." *Id.* at 27. The conduct of the officers is judged by an objective standard taking the totality of the circumstances and information available to the officers into account. *Id.* at 21-22.

A **Terry** stop is evaluated under a two-part analytical framework. First, we ask whether the stop was justified at its

inception.  Second, our inquiry focuses on whether the stop was reasonably related in scope to the circumstances which justified the interference in the first place. ***United States v. Gregory***, ___ F.3d ___, 1996 WL 118269, at *3 (10th Cir. March 18, 1996); ***United States v. Brown***, 24 F.3d 1223, 1226 n. 2 (10th Cir. 1994).

In the instant case, we conclude there are four reasons the Task Force possessed sufficient information to raise a reasonable suspicion Mr. Phommachanh was involved in the two Sonic Drive-In robberies and the Mandarin Restaurant robbery/murder.  First, the Task Force believed the nature of the Sonic Drive-In robberies implicated an employee or former employee, and Mr. Phommachanh had previously worked at the first restaurant robbed.  Second, a witness to the first robbery identified Mr. Phommachanh as one of the perpetrators based on his voice and mannerisms.  Third, the similarity of the two crimes and ballistics evidence linked the two Sonic Drive-In robberies indicating to the Task Force both were committed by the same people.  Fourth, the information the Task Force learned from Mrs. Phommachanh that she feared her son was involved in gang activities and might also specifically be involved in the Sonic Drive-In and Mandarin robberies served to confirm the Task Force's existing information suggesting Mr. Phommachanh's involvement.[5]  The combination of all this information was

---

[5] Souphaphone Lang argues when she testified at the suppression hearing Mrs.

(continued...)

sufficient to give the Task Force reasonable suspicion justifying an investigatory stop of the Blazer to question Mr. Phommachanh.

In addition, the Langs argue the Task Force's mistake of Douangmala Lang as Mr. Phommachanh was not reasonable. Souphaphone and Douangmala Lang argue two of the members of the Task Force possessed additional relevant information which should have assisted them in recognizing Douangmala was not Mr. Phommachanh. On November 17, twelve days prior to the incident, Souphaphone Lang was interviewed by Detective Mervosh who took a personal and family history of him during the interview where he learned Souphapone had a brother named Douangmala. Further, Officer Mumma participated in a stop of a vehicle where Mr. Phommachanh was a passenger approximately six to eight months earlier. The Langs argue this additional information renders the mistake of identity unreasonable.

The evidence is uncontroverted that Agent Jablonski made the decision to stop the Blazer on his own without discussing it with the other members of the Task Force. Although the Task Force members did commonly pool information about the cases they were

---

[5](...continued)
Phommachanh explained she never told Detective Mervosh she thought her son was specifically involved in the Sonic Drive-In and Mandarin robberies, but simply feared her son's participation in criminal and gang activities generally. This certainly represents a fair reading of Mrs. Phommachanh's testimony. However, our standard of review requires us to view the evidence in the light most favorable to the district court's ruling. Accordingly, we must accept Detective Mervosh's contrary testimony Mrs. Phommachanh specifically mentioned she feared her son was involved in these three robberies.

working on, nothing in the record even suggests Agent Jablonski was privy to the additional information attributable to Detective Mervosh or Officer Mumma. We are unpersuaded by the Langs' argument all the information known to one of the Task Force agents is attributable to Agent Jablonski absent some evidence they communicated the specific information to him so it factored into his decision-making process. What is at issue here is whether Agent Jablonski's mistake of identity was reasonable under the circumstances; and, as the district court pointed out, he had no contact with and had never seen Souphaphone and Douangmala Lang or Mr. Phommachanh prior to November 29.

Further, the Langs argue the mistake of identity was unreasonable because of the physical dissimilarities between Douangmala Lang and Mr. Phommachanh. Agent Jablonski had both a mug shot and a description of Mr. Phommachanh which described him as between 5'3" and 5'6" in height, and weighing 140 to 150 pounds, with a shaved head or a closely cropped hairstyle and facial hair. In contrast, Douangmala Lang was between 5'10" and 6'0" tall, weighed 160 to 190 pounds, and had a different hairstyle. These descriptions are patently different. However, Agent Jablonski testified he had approximately ten seconds to observe Douangmala Lang on his two trips between the mobile home and the Blazer from a distance of fifty to seventy yards. He also observed Douangmala Lang by driving alongside the Blazer and making a visual comparison

between the mug shot pictures and the physical features of the vehicle's passenger. The brief time period and the difficulty of identifying someone in a moving vehicle must be taken into consideration in evaluating the reasonableness of Agent Jablonski's mistake. In addition, the district court specifically found the mug shot picture of Mr. Phommachanh "looked very much like Douangmala Lang." Agent Jablonski had the best opportunity to compare Douangmala Lang's facial features with the mug shot. His opportunity to compare Douangmala Lang's height and weight to the suspect's was hindered by the limited time period he saw him walking to and from the Blazer, and Douangmala Lang's seated position in the vehicle. Under the totality of the circumstances, we cannot conclude Agent Jablonski's misidentification of Douangmala Lang as Mr. Phommachanh was unreasonable. Accordingly, we hold the Task Force possessed sufficient justification to stop the Blazer.

Next, the Langs contend the scope of the stop and the ensuing searches exceeded the Task Force's justification for the stop. Under *Terry's* second prong, the duration and extent of the seizure must be evaluated based upon "the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20. After the Blazer was stopped, both Souphaphone and Douangmala Lang were ordered to get out of their vehicle and subjected to pat down

- 24 -

searches for weapons.  The question is whether these actions are objectively reasonable under the circumstances.

We have previously noted:  "Since police officers should not be required to take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and maintain the status quo during the course of [a **Terry**] stop.'" *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) (quoting **United States v. Hensley**, 469 U.S. 221, 235 (1985) (alterations in original)).  The Task Force agents' actions in this case were entirely consistent with this principle.  It was reasonable for the Task Force to conduct a pat down search because they legitimately believed Douangmala Lang was Mr. Phommachanh.  Mr. Phommachanh was a suspect in two armed robberies and a robbery/murder.  It was reasonable for the Task Force to believe he and his traveling companion, who himself was a potential accomplice in the robberies, might be armed and dangerous.  The Task Force's decision to conduct a pat down search was reasonable to protect the agents' personal safety.  In **Perdue**, we approved the officers' actions of executing the **Terry** stop with their weapons drawn and ordering the suspect to exit his car and lie down on the ground "as a means of neutralizing the potential danger."  *Id.* at 1462-63.  The Task Force's actions here were less intrusive and equally reasonable under the circumstances.

The Langs argue, however, once Douangmala informed Officer Mumma he was Joe Lang and Detective Mervosh recognized Souphaphone, the Task Force should have stopped to check the Langs' identities. We disagree. First, Detective Mervosh's recognition of Souphaphone Lang is irrelevant to determining Douangmala Lang's identity. Second, while there is a factual dispute about when Douangmala Lang told Officer Mumma he was Joe Lang, we see no need to resolve it because there is no question Douangmala Lang's identity was not *confirmed* until after the completion of the pat down search. It is unreasonable to expect officers to stop a pat down search of a suspect they reasonably believe may be armed and dangerous simply based on the suspect's unconfirmed statement of his identity. Under these circumstances, we believe Officer Mumma acted properly by completing his pat down search of Douangmala Lang prior to seeking his identification to determine his identity.

Individually, Douangmala Lang challenges Officer Mumma's pat down search which disclosed the cocaine.[6] Initially, he contends once Officer Mumma concluded the bulge in his left front pants pocket was not a weapon he should have stopped the search. However, the Supreme Court has held a police officer may seize nonthreatening contraband detected during a protective pat down

_____

[6] Souphaphone Lang also raises this issue. In response, the government argues Souphaphone Lang lacks Fourth Amendment standing to challenge the search of his brother. Our disposition of the issue renders Souphaphone Lang's argument moot, so we need not address his standing.

search permitted by **Terry**. **Minnesota v. Nickerson**, 508 U.S. 366, ___, 113 S.Ct. 2130, 2136 (1993). The Court reasoned:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain view context.

**Id.** at 2137 (citations and footnote omitted). Under **Nickerson**, Officer Mumma's discovery of the plastic bag of cocaine in Douangmala Lang's pocket was reasonable because there is no evidence he did anything more intrusive than a simple pat down search.

However, in this case, the search does not stand or fall based on **Nickerson** because Officer Mumma twice asked for and received Douangmala Lang's consent to search his pocket. A search is reasonable under the Fourth Amendment if voluntary consent is given to the police before the search. The voluntariness of a consent to search is examined under the totality of the circumstances with the government bearing the burden of proof. **United States v. McCurdy**, 40 F.3d 1111, 1119 (10th Cir. 1994). "The 'government must show that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given.'" **Id.** (quoting **United States v. Zapata**, 997 F.2d 751, 758 (10th Cir. 1993); *see also* **United States v. Melendez-**

*Garcia*, 28 F.3d 1046, 1053-54 (10th Cir. 1994). The district court concluded, based on Officer Mumma's testimony, Douangmala Lang voluntarily consented to the search of his left front pants pocket. Douangmala Lang has offered nothing to disturb this finding on appeal, and our review of Officer Mumma's testimony supports the district court's conclusion.

Finally, Souphaphone and Douangmala Lang assert Officer Mumma's discovery of the cocaine on the passenger's side of the Blazer's floorboard does not meet the requirements of the plain view exception. Law enforcement authorities may seize contraband in plain view without a warrant if three conditions are met: (1) the law enforcement authorities are lawfully in a position from which they may view the object; (2) the object's incriminating character is immediately apparent; and, (3) the authorities have a lawful right of access to the object. *Nickerson*, 113 S.Ct. at 2136-37; *United States v. Naugle*, 997 F.2d 819, 822 (10th Cir.), *cert. denied*, 114 S.Ct. 562 (1993); *United States v. Corral*, 970 F.2d 719, 723 (10th Cir. 1992). The Langs argue the first and third factors have not been established in this case. Souphaphone and Douangmala Lang assert the Task Force agents initial stop of the Blazer was improper so they were not lawfully in a position to view the cocaine on the vehicle's floorboard. We have already concluded the stop of the Blazer was appropriate. Further, the Langs argue the cocaine was underneath the passenger seat on the

floorboard and therefore not within plain view. Unfortunately, the Langs offer no specific evidence demonstrating the truth of their assertion to contradict Officer Mumma's testimony he spied the cocaine on the floorboard in front of the passenger seat through the open passenger door while frisking Douangmala Lang. We hold the cocaine first discovered in the Blazer by Officer Mumma falls within the plain view exception to the warrant requirement.

In summary, we conclude the district court properly denied Souphaphone and Douangmala Lang's motion to suppress. The Task Force agents possessed reasonable suspicion to stop the Blazer; Agent Jablonski's mistake of Douangmala Lang as Fongyxmany Phommachanh was reasonable; the pat down searches of Souphaphone and Douangmala Lang were justified as a reasonable precautionary measure to ensure the Task Force agents' safety; the search did not exceed the scope of the initial impetus for the investigatory stop; and Officer Mumma discovered the initial cocaine found in the Blazer within plain view.

IV.

Finally, Souphaphone and Douangmala Lang challenge their sentences. Specifically, both Langs argue the district court erred by imposing a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 after finding Souphaphone and

Douangmala Lang committed perjury when they testified at their trial.

We review the factual findings supporting the application of a particular Sentencing Guideline provision for clear error. *United States v. Edwards*, 69 F.3d 419, 440 (10th Cir. 1995), *petition for cert. filed*, 64 U.S.L.W. 3593 (Feb. 23, 1996). In so doing, we give due deference to the district court's factual findings based on its observation of the testimony given at trial including the demeanor of the witnesses. *United States v. Yost*, 24 F.3d 99, 106 (10th Cir. 1994).

The Sentencing Guidelines provide for a two-level enhancement if the defendant willfully attempts or succeeds in obstructing or impeding the administration of justice. U.S.S.G. § 3C1.1. The application notes make clear "committing, suborning, or attempting to suborn perjury" is conduct sufficient to trigger this enhancement. U.S.S.G. § 3C1.1 (n.3(b)). "A defendant commits perjury if he gives false testimony under oath concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." *United States v. Owens*, 70 F.3d 1118, 1132 (10th Cir. 1995) (citing *United States v. Dunnigan*, 507 U.S. 87, ___, 113 S.Ct. 1111, 1116 (1993)).

In the instant case, the presentence reports for both Souphaphone and Douangmala Lang recommended a two-level enhancement

for an obstruction of justice. Both presentencing reports concluded the brothers committed perjury when they testified at trial. Souphaphone and Douangmala Lang objected to the recommendation, but after holding a sentencing hearing, the district court agreed with the probation office and imposed the U.S.S.G. § 3C1.1 enhancement.

On appeal, Souphaphone and Douangmala Lang argue the district court erred on two grounds. First, the Langs assert the court failed to make the requisite specific factual findings they willfully committed perjury to impede the administration of justice. They contend the court only made a general statement finding Souphaphone and Douangmala Lang's testimony perjurious. Second, the Langs maintain they did not commit perjury. Instead, they characterize the differences in their testimony from the Task Force agents as merely a factual dispute. The Langs argue they were improperly punished simply for exercising their right to testify on their own behalf. We conclude these arguments are without merit.

In **Dunnigan**, the Supreme Court explained a sentencing court "must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same ...." **Dunnigan**, 113 S.Ct. at 1117. Since the Court's decision, we have elaborated the type of findings required:

- 31 -

> We do not mean to imply the district court must recite the perjurious testimony verbatim. The district court must generally identify the testimony at issue from his or her trial notes or memory and it is sufficient if such testimony is merely described in substance so that when we review the transcript we can evaluate the *Dunnigan* findings of the elements of perjury against an identified line of questions and answers without having simply to speculate on what the district court might have believed was the perjurious testimony.

*United States v. Massey*, 48 F.3d 1560, 1574 (10th Cir.), *cert. denied*, 115 S.Ct. 2628 (1995). The district court complied with *Dunnigan* and *Massey* in this instance. For Souphaphone Lang, the district court focused on the defendant's testimony he did not know there was any cocaine in the Blazer until after he was arrested and his denial of knowledge about the cocaine found inside a rolled pair of socks in his dresser drawer in his bedroom. Similarly, for Douangmala Lang, the court specified his testimony he planned to take the cocaine and dispose of it in the river as a favor for Mr. Phommachanh. The court's focus on this specific testimony it considered perjurious was sufficient to allow us to review the substance of its finding, which is all that is required by *Dunnigan* and its progeny in this circuit. The court's findings are favorably compared with those instances where we have previously held a sentencing court's findings were not specific enough. *Compare United States v. Markum*, 4 F.3d 891, 898 (10th Cir. 1993) ("The record does not contain a specific finding that independent of the jury verdict, defendant committed perjury. Nor does it

- 32 -

suggest what particular testimony the district court found untrue."); ***United States v. Hansen***, 964 F.2d 1017, 1020 (10th Cir. 1992) ("[T]he district court's finding that both it and the jury *may* not have believed the defendant's testimony stops well short of a finding that the defendant perjured himself.  Further, the trial court's statement as to finding the defendant untruthful was not in specific regards to any testimony given by the defendant.").

The Langs characterize any discrepancies or inconsistencies in their testimony in comparison to the Task Force agents' and their prior inculpatory statements as merely a factual dispute insufficient to warrant a finding of perjury.  We disagree.  Our review of the record convinces us both Souphaphone and Douangmala Lang knowingly lied on the witness stand during their trial.  Like the district court, we find much of their trial testimony at the least highly  inconsistent and at the most preposterous.  We reject the Langs' assertion they received the two-level enhancement simply because they decided to testify on their own behalf.  Accordingly, we conclude the district court properly enhanced Souphaphone and Douangmala Lang's sentences pursuant to U.S.S.G. § 3C1.1.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTENCING.**