# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59544-3-II |
| Respondent, | |
| v. | |
| S.H.-M., | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Police officers identified three suspects in a series of drive-by shootings in Tacoma and started surveilling an apartment complex connected to the suspects. Officers had photographs of the suspects and learned their ages, heights, and weights. One officer surveilling the apartment complex, Officer Angel Castaneda, saw three young people exit the apartment building, get into a car, and drive away. Castaneda mistakenly believed that the young people were the drive-by shooting suspects and pulled over the vehicle, initiating a *Terry*[1] stop. When officers approached the vehicle, they saw a handgun in plain view near the front passenger seat where SH-M was riding. The State charged SH-M with second degree unlawful possession of a firearm.

SH-M moved to suppress the firearm as a fruit of an unlawful *Terry* stop. At the suppression hearing, Castaneda testified that he believed the three young people he saw were the suspects because they were the first group of three he had seen during his surveillance of the apartment complex, they were similar to the suspects in age and general physical descriptions, and he thought the rear passenger strongly resembled one of the suspects. But the State did not elicit

---

[1] *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

testimony explaining the specific similarities that led Castaneda to conclude that any of the three people were the suspects.

The trial court found that Castaneda was credible when he said he thought the rear passenger was one of the suspects, and that Castaneda's misidentification of the rear passenger was made in good faith. But the trial court also said the State did not provide a photograph of the rear passenger, so the trial court did not conduct an independent evaluation of Castaneda's conclusion that the rear passenger was one of the suspects. Relying primarily on Castaneda's good faith, the trial court determined the stop was based on reasonable, articulable grounds. The trial court concluded that the *Terry* stop was therefore lawful and denied the motion to suppress.

SH-M appeals the denial of his suppression motion. We affirm the trial court's finding that Castaneda's misidentification was made in good faith. But the State failed to present clear and convincing evidence of physical similarities between the suspects and the young people the police detained to support reasonable, articulable grounds necessary for a valid *Terry* stop. The trial court relied instead almost exclusively on Castaneda's good faith, which is not enough. We reverse.

FACTS

I. BACKGROUND

In November 2022, the Tacoma Police Department was investigating a series of drive-by shootings. Police developed probable cause to arrest three suspects: Treyve'onn Loder; Dejhon Orange; and NAW, a teenaged minor. All three of the suspects were young people of color with connections to a particular apartment complex in Tacoma. Loder was 18 years old; 6 feet, 2 inches tall; and weighed 220 pounds. Orange was 18 years old; 6 feet, 1 inch tall; and weighed 162 pounds. NAW was 15 years old; 5 feet, 11 inches tall; and weighed 140 pounds.

At a law enforcement briefing, Officer Angel Castaneda received photos of the drive-by shooting suspects, physical descriptions including height and weight, and information about their connection to the apartment complex. Castaneda learned that the police had probable cause to arrest all three suspects.

Castaneda was assigned to a surveillance team and drove to the apartment complex identified in the briefing. Castaneda watched the apartments through binoculars from his car and observed "a number of people" coming and going over the course of the day. 1 Verbatim Rep. of Proc (VRP) (Feb. 27, 2024) at 88. He kept a copy of the law enforcement brief, including pictures of the suspects, in his car.

## II. *TERRY* STOP

After about six and a half hours of surveillance, Castaneda saw three young people—SH-M, Andrew Salave'a, and Daniel Zepeda—leaving the apartment complex together. They were the first group of three that Castaneda had seen at the complex. For about 10 seconds, Castaneda watched the trio walk from the front door of the complex toward the street where they got into a black Dodge Charger and drove away. Castaneda believed that the three young people he saw getting into the Charger "matched the general description" of the drive-by shooting suspects, and he thought that the rear passenger, Salave'a, was Loder. 1 VRP at 34 (Feb. 27, 2024). Salave'a was 5 feet, 11 inches tall and weighed 265 pounds, making him 3 inches shorter and 45 pounds heavier than Loder.

Based on their location at the apartment complex, the fact that they were a group of three young people, and Castaneda's misidentification of Salave'a as Loder, Castaneda and several other patrol cars followed the Charger for about 30 minutes. The police pulled over the Charger,

surrounded it with guns drawn, and ordered the occupants out of the car one by one. All three young people complied, and police detained them.

After the young people were out of the car, police immediately saw a firearm in plain view between the passenger seat and the door where SH-M had been riding. Police then asked the occupants of the Charger for their names and learned that they were not the drive-by shooting suspects. Castaneda expressed surprise that Loder was not in the vehicle, and he told fellow officers, "I ID'd Loder" and "He looks just like him." Ex. 103A at 6 min., 32 sec. to 6 min., 35 sec.; *see also* 1 VRP (Feb. 27, 2024) at 53-54.

### III. MOTION TO SUPPRESS THE FIREARM

The State charged SH-M with second degree unlawful possession of a firearm. SH-M moved to suppress the firearm as the fruit of an unlawful *Terry* stop. SH-M argued that simply observing three young people leaving an apartment building and getting into a car was not sufficient to create the reasonable suspicion needed to conduct a warrantless traffic stop. The State responded that Castaneda had a reasonable, articulable suspicion to stop the Charger under the circumstances, and that his misidentification of Salave'a as Loder was made in good faith.

A.     Evidence Presented

At the suppression hearing, Castaneda testified that he stopped the young people in the Charger because they "matched the general description of the three subjects we were looking for" and he "identified one of the subjects we believed to be" Loder. 1 VRP (Feb. 27, 2024) at 34. When asked why he "fixated on" the trio he saw getting into the Charger, Castaneda explained,

> [T]here were three individuals specifically who were together during these series
> of shootings. So initially when all three came out and together, if anything, it was
> the only . . . multiple [of] three observed leaving the apartment, especially their age,
> their physicals, the subject in the rear seat [Salave'a] appearing strongly as Loder -

4

> - in my eyes and other . . . officers' eyes -- and then leaving, we believed, like, this is going to be them.

1 VRP (Feb. 27, 2024) at 73. Castaneda did not describe specific similarities between the three suspects and the three young people he saw coming out of the apartment complex: he did not mention their races, skin tones, heights, body types, eye colors, hair colors, or hairstyles. He also testified that he had seen a photo of Loder, but he did not say that he consulted the photo to compare it with the three people before stopping the Charger.

The trial court admitted the written law enforcement briefing regarding the drive-by shooting investigation as an exhibit. The briefing included photos and physical attributes of the three suspects. The trial court also viewed body-worn camera footage from multiple officers who were present when the trio was ordered out of the car. In some of the footage, Salave'a can be seen at a distance as officers handcuff him. The footage is low quality and shows only that Salave'a was a young person of color who may have had a similar hairstyle to Loder. In the footage, Salave'a appears to have a slightly darker complexion than Loder. The trial court also heard evidence that the young people in the Charger were of different heights and weights than the shooting suspects. The State did not offer a still photo of Salave'a into evidence.

The body-worn camera footage also shows that shortly after officers learned the identities of the three detained people, Castaneda expressed surprise that none of the drive-by shooting suspects were in the Charger.

B.      Denial of the Motion to Suppress the Firearm

The trial court concluded that the stop was lawful and denied SH-M's motion to suppress the firearm. The trial court explained its ruling:

Officer Castaneda was provided with photographs of the three juvenile suspects, which this Court had the opportunity to look at. They were also provided with general physical descriptions. Officer Castaneda surveilled the apartment complex for six and a half hours and didn't follow up or follow anybody else. He then saw three individuals matching the general physical description leave the apartment, but specific[ally], he saw somebody -- last name [Salave'a] -- that he believed was Treyveonn Loder.

Now, I was not provided with a picture of Mr. [Salave'a], so I can't make any finding as to whether or not he appeared similar to Mr. Loder, but I will say, based on Officer Castaneda's demeanor and reaction in testimony, I find it credible that Officer Castaneda, in the 10 seconds he observed him, believed that Mr. [Salave'a] was Mr. Loder.

So the initial stop was lawful based on the circumstances involved, the location detail, three suspects matching the general description, the specific identification -- mistaken identification of [Salave'a] as Treyveonn Loder, and I also found Officer Castaneda's testimony credible because it was further bolstered when he can be heard exclaiming on [the body-worn camera footage] that he'd identified Loder and expressed surprise that it wasn't Loder who was in the Dodge Charger. So Officer Castaneda acted in good faith and had a reasonable articulable ground to believe that he had identified Loder.

1 VRP (Feb. 27, 2024) at 125-26.

The trial court entered written findings and conclusions consistent with its oral ruling. The trial court found that "Officer Castaneda believed that these three individuals were Orange, Loder[,] and [NAW] based on their physical appearance, their association with the [apartment complex], and they were the only group of three individuals seen that day." Clerk's Papers (CP) at 226 (Findings of Fact (FF) 10). The trial court also found that "Officer Castaneda's misidentification was done in good faith." CP at 227 (FF 15). Officer Castaneda's testimony was credible based on its content, his demeanor, and body-worn camera footage in which he expressed surprise that Salave'a was not Loder. The trial court made no specific findings about similarities in the physical appearances of the drive-by shooting suspects and the young people whom the officers detained. The trial court concluded that "Officer Castaneda had reasonable articulable suspicion to stop the Dodge Charger" CP at 229 (Conclusions of Law 6).

6

After a bench trial, the trial court found SH-M guilty of second-degree unlawful possession of a firearm and sentenced him to thirty days of confinement in a juvenile detention facility. SH-M appeals.

ANALYSIS

SH-M argues that the trial court erred when it denied his motion to suppress the evidence found as a result of the traffic stop because the stop was a violation of his rights under the Fourth Amendment to the United States Constitution and article 1, section 7 of the Washington Constitution. Although we agree with the trial court that Castaneda's identification was made in good faith, we agree with SH-M that the State did not present clear and convincing evidence at the suppression hearing sufficient to support a reasonable, articulable suspicion for the *Terry* stop.

I. *TERRY* STOPS

Under the Fourth Amendment and article I, section 7 of the Washington Constitution, law enforcement may not seize an individual without a warrant unless a specific exception applies. *State v. Z.U.E.*, 183 Wn.2d 610, 617, 352 P.3d 796 (2015). The State bears the burden of showing by clear and convincing evidence that a warrantless seizure falls within an exception. *Id.* If the State fails to meet this burden, the court must suppress the fruits of the unlawful seizure. *State v. Tysyachuk*, 13 Wn. App. 2d 35, 43, 461 P.3d 403 (2020).

One exception to the warrant requirement is an investigative *Terry* stop. In a challenge to a trial court's ruling admitting evidence obtained as a fruit of a *Terry* stop, we review the trial court's findings of fact for substantial evidence and the legal determinations de novo. *State v. Fuentes*, 183 Wn.2d 149, 157, 352 P.3d 152 (2015). Evidence is substantial if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise. *State v. Carter*, 3

7

Wn.3d 198, 212, 548 P.3d 935 (2024). Whether a warrantless investigative stop was ultimately justified is a question of law that we review de novo. *Tysyachuk,* 13 Wn. App. 2d at 44.

A.      Investigative Stops Are Lawful If They Are Supported by Reasonable Suspicion of Particular Criminal Activity

An officer can briefly detain a person without a warrant based on the officer's "'reasonable, articulable suspicion'" of criminal activity. *State v. Day*, 161 Wn.2d 889, 896, 168 P.3d 1265 (2007) (quoting *State v. Duncan*, 146 Wn.2d 166, 172, 43 P.3d 513 (2002)). The officer's suspicion must be "based on specific and articulable facts known to the officer at the inception of the stop." *Fuentes*, 183 Wn.2d at 158. Reasonable, articulable suspicion is evaluated based on the totality of circumstances known to the officer, including "the officer's training and experience, the location of the stop, the conduct of the person detained, the purpose of the stop, and the amount of physical intrusion on the suspect's liberty." *Id.* "While we evaluate the totality of the circumstances to determine whether a reasonable suspicion of criminal activity exists, we do so, in part, by examining each fact identified by the officer as contributing to that suspicion." *Id.* at 159.

Federal cases hold that a *Terry* stop may be justified based on an officer's mistake of fact, including a mistaken identity, so long as the mistake itself was reasonable and based on articulable facts known to the officer at the time of the stop. For instance, in *United States v. Lang*, the Tenth Circuit upheld a *Terry* stop based on a police officer's reasonable misidentification of a car passenger. 81 F.3d 955, 966 (10th Cir. 1996). There, the officer had a mug shot and a description of a murder suspect that outlined the suspect's height, weight, and hairstyle. *Id.* After making "a visual comparison between the mug shot pictures and the physical features of the vehicle's passenger," the officer mistakenly concluded that the passenger was his suspect and detained him. *Id.* Though Lang's height and weight differed from the suspect's, "the district court specifically

found the mug shot picture of [the suspect] 'looked very much like . . . Lang.'" *Id.* (quoting record). Considering the finding about their similar appearances, the 10-second time period the officer had to make the comparison, and the difficulty of identifying someone in a moving vehicle, the Tenth Circuit held that the misidentification was reasonable and, accordingly, the stop was justified. *Id.*

However, the Washington Supreme Court has held that general physical similarities alone do not create a reasonable, articulable suspicion that justifies misidentification. In *State v. Smith*, the court held that officers lacked reasonable, articulable grounds to arrest a person who "matched the general physical description" of the suspect they sought. 102 Wn.2d 449, 454, 688 P.2d 146 (1984). Although *Smith* concerned an erroneous arrest rather than a *Terry* stop, it is relevant here because the court addressed whether the misidentification was based on "reasonable, articulable grounds." *Id.*

The *Smith* court explained, "The mere fact that petitioner fit the description of a brown-haired, white male, 5 feet 10 inches tall, weighing 145 pounds, is insufficient to meet the *Sanders* test of reasonable, articulable grounds to believe that the suspect is the intended arrestee." *Id.* (citing *Sanders v. United States*, 339 A.2d 373, 379 (D.C. 1975)). The court also pointed out that the arrest warrant specified the suspect had tattoos on both hands, but the officers failed to check the arrestee's hands before detaining and searching him. *Id.* at 451-52.

B.      Good Faith in the *Terry* Analysis

An officer's good faith belief in their reasons for making a *Terry* stop is highly relevant to determining if a stop was pretextual—that is, if the investigating officer's given reason for detaining an individual is not their true reason. *State v. Ladson*, 138 Wn.2d 343, 358, 979 P.2d 833 (1999); *see also State v. Day*, 161 Wn.2d 889, 896-97, 168 P.3d 1265 (2007). This is significant

because pretextual stops are unconstitutional in Washington. *Ladson*, 138 Wn.2d at 345. However, it is clear that there is no general "good faith" exception to the exclusionary rule under the Washington Constitution. *State v. Afana*, 169 Wn.2d 169, 184, 233 P.3d 879 (2010). And our courts have explicitly distinguished good faith from reasonable, articulable suspicion in related contexts.

For example, in *Smith*, the Washington Supreme Court noted that "evidence is properly admissible against a person mistakenly arrested as long as arresting officers act in good faith *and* have reasonable, articulable grounds to believe that the suspect is the intended arrestee." 102 Wn.2d at 453 (emphasis added). The court did not consider the officers' subjective belief that they had the right person when evaluating whether they had reasonable, articulable grounds to arrest Smith. *See id.* at 454-56. Thus, while good faith informs the question of whether a stop is pretextual, more concrete facts are necessary to show that a misidentification is reasonable. *See State v. Creed*, 179 Wn. App. 534, 541-42, 319 P.3d 80 (2014) (declining to hold that an officer had a reasonable suspicion to stop a vehicle based on the officer's "good faith" misreading of the license plate number).

C.  Substantial Evidence Supports the Challenged Findings of Fact

SH-M first assigns error to two of the trial court's findings of fact. First, SH-M challenges the trial court's finding that "Officer Castaneda believed that these three individuals were Orange, Loder[,] and [NAW] based on their physical appearance, their association with the [apartment complex], and they were the only group of three individuals seen that day." CP at 226 (FF 10). Second, SH-M challenges the trial court's finding that "Officer Castaneda's misidentification was

done in good faith." CP at 227 (FF 15).[2] We hold that substantial evidence in the record supports both findings, which are closely related.

Officer Castaneda testified that he thought the young people in the Charger were the three drive-by shooting suspects because they were "the only multiple [of] three observed leaving the apartment, especially their age, their physicals, the subject in the rear seat appearing strongly as Loder -- in [Officer Castaneda's] eyes and other . . . officers' eyes." 1 VRP (Feb. 27, 2024) at 73. The trial court found that Castaneda's testimony was credible based on his demeanor in court and on the body-worn camera footage in which he expressed surprise upon learning that Salave'a was not Loder. Castaneda's credible testimony about what he believed is substantial evidence that supports both challenged findings.

We hold that substantial evidence supports the trial court's findings that Officer Castaneda believed in good faith that Salave'a was Loder and that the three people he saw in the Charger were the three drive-by shooting suspects.

D.      Reasonable Articulable Suspicion Does Not Support the *Terry* Stop

SH-M next argues that the trial court erred as a matter of law when it determined that Officer Castaneda had a reasonable articulable suspicion that Salave'a was Loder and concluded on that basis that the *Terry* stop was justified. Although the trial court's conclusion that Officer Castaneda "had reasonable articulable grounds to believe [Salave'a] was Loder" is included in its findings of fact, this statement is best characterized as an application of the law to the facts, which

---

[2] This finding reads in full: "Officer Castaneda's misidentification was done in good faith, and he had reasonable articulable grounds to believe [Salave'a] was Loder." CP at 227 (FF 15). Because the second clause of this finding is a distinct inquiry, and a legal conclusion rather than a factual finding, we treat it separately below.

we review de novo. CP at 227 (FF 15); *State v. Cole*, 122 Wn. App. 319, 323, 93 P.3d 209 (2004) (we review mislabeled findings and conclusions for what they actually are).

The trial court relied heavily on Officer Castaneda's good faith when it concluded that the misidentification was reasonable and, on that basis, the *Terry* stop was lawful. But while Castaneda's good faith suggests the *Terry* stop was not impermissibly pretextual, it does not demonstrate that the stop was supported by reasonable and articulable grounds. To justify a *Terry* stop, an officer's suspicion must be "based on *specific* and *articulable* facts." *Fuentes*, 183 Wn.2d at 158 (emphasis added). Castaneda's good faith is not enough.

There were some articulable facts here supporting the trial court's conclusion that the stop was reasonable: SH-M, Salave'a, and Zepeda were leaving the apartment complex police had connected to the shooting suspects and were, like the suspects, a group of three young people. But the State failed to present the trial court with enough specific evidence of physical similarities between the young people in the Charger and the shooting suspects—and specifically between Salave'a and Loder—to support the court's conclusion that the stop was based on a reasonable, articulable suspicion.

Significantly, the State failed to elicit any testimony from Officer Castaneda about specific similarities he observed between Salave'a and Loder. Although Officer Castaneda's misidentification of Salave'a was the main catalyst for the stop, the State did not ask Castaneda to testify to the features Salave'a and Loder shared, nor did the State ask him to explain the reasons for his misidentification. Castaneda testified only that he began following the young people because they were leaving the apartment complex police were surveilling and they "matched the general description of the three subjects we were looking for." 1 VRP (Feb. 27, 2024) at 34. He

12

vaguely referenced the young people's "age [and] their physicals" and claimed that "the subject in the rear seat appear[ed] strongly as Loder." 1 VRP (Feb. 27, 2024) at 73. But, as discussed above, Castaneda's statement he subjectively believed that Salave'a appeared to be Loder, even if credible, is not enough. Under *Smith*, a misidentification must be based on more than a "general physical description" for courts to conclude it is grounded in reasonable, articulable suspicion. 102 Wn.2d at 453.

Additionally, although the State provided the court with photos of the shooting suspects, it did not provide photos of the young people in the Charger for comparison. While SH-M, Salave'a, and Zepeda appear briefly in police body camera footage that was admitted to evidence, the footage quality was poor and the trial court did not say that it independently compared the video with the pictures of the suspects and found Castaneda's misidentification to be reasonable. Without a photo for comparison, the court ultimately said it could not "make any finding as to whether or not [Salave'a] appeared similar to Mr. Loder." 1 VRP (Feb. 27, 2024) at 125. The trial court also did not find that SH-M or Zepeda appeared similar to any of the shooting suspects. The trial court's inability to compare Salave'a's appearance to Loder's distinguishes this case from *Lang*, where "the district court specifically found the mug shot picture of [the suspect] 'looked very much like . . . Lang.'" 81 F.3d at 966 (quoting record).

Finally, there were marked differences in height and weight between the shooting suspects and the young people in the Charger. Salave'a was 3 inches shorter and 45 pounds heavier than Loder, which suggests that the two would have had different builds. SH-M's and Zepeda's heights and weights were also significantly different from those of the other shooting suspects. These body-type dissimilarities make it all the more significant that the State did not prompt Officer

13

Castaneda to explain why he thought Salave'a looked like Loder or to identify any specific physical traits—such as skin tone, hair color, hairstyle, or eye color—that the two shared. Considering the physical differences between Salave'a and Loder alongside the State's failure to elicit testimony from Castaneda about specific attributes they shared or to provide comparison photos for the court, we conclude the State did not meet its clear and convincing burden. Finally, the testimony using vague terms saying only that SH-M and Zepeda "matched the general description of" the other two suspects was plainly insufficient to meet the clear and convincing burden for establishing reasonable articulable suspicion. *See* 1 VRP (Feb. 27, 2024) at 34.

In sum, we cannot say that the *Terry* stop was based on reasonable, articulable grounds under the totality of the circumstances.

CONCLUSION

We do not disturb the trial court's conclusion that Officer Castaneda's misidentification was made in good faith. But Washington courts must suppress evidence even when the police "have erred innocently" if failing to do so would violate an individual's constitutional rights. *Day*, 161 Wn.2d at 894. Because the State did not present clear and convincing evidence that the investigatory stop of SH-M and his companions was reasonable, we reverse.

59544-3-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

GLASGOW, C.J.

We concur:

LEE, P.J.

PRICE, J.

15