IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

STATE OF WASHINGTON,               )
                                   )        No. 30893-6-III
              Appellant,           )
                                   )
       v.                          )
                                   )
JOANNE ALYSSE CREED                )
aka JOANNE ALYSSE NEYMAN,          )
                                   )        PUBLISHED OPINION
              Respondent and       )
              Cross Appellant.     )

SIDDOWAY, J. — In *State v. Snapp*, 174 Wn.2d 177, 275 P.3d 289 (2012), the Washington Supreme Court held that a police officer's *Terry*[1] stop of a driver on a dark evening for failure to have his headlights illuminated was supported by a reasonable, articulable suspicion even though it was later demonstrated that the officer stopped the driver only 24 minutes after sunset, whereas the applicable statute, RCW 46.37.020, generally requires that headlights be illuminated beginning one-half hour after sunset. "[T]he question of a valid stop does not depend upon [a defendant's] actually having violated the statute," the court held, "[r]ather, if [the officer] had a reasonable suspicion that he was violating the statute, the stop was justified." *Snapp*, 174 Wn.2d at 198.

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

In this case, the state of Washington asks us to extend the holding in *Snapp* to a *Terry* stop by a police officer who misread a license plate number, obtained information that the wrong number he reported was associated with stolen plates, and on that basis stopped a car bearing different-numbered plates and detained its driver.

An officer may reasonably suspect that it is a half hour after sunset, thereby requiring illuminated headlights, even though later, more complete information reveals that he was mistaken. An officer cannot reasonably believe that a car bears stolen license plates based on a WACIC[2] report addressing an unrelated license plate number. We affirm the trial court, which properly granted the motion to suppress.

FACTS AND PROCEDURAL BACKGROUND

As part of a routine check during his nighttime patrol, Officer Gabe Ramos observed a car being driven by Joanne Creed and attempted to run its license plate number against the WACIC database. The WACIC database is a compilation of vehicle information and plate numbers from stolen vehicles and license plates, among other information. Although the number on Ms. Creed's license plate was 154 YDK, Officer Ramos misread it and entered "154 YMK" into his computer. The WACIC printout returned for license plate 154 YMK indicated that it was stolen. Based solely on this information, Officer Ramos initiated a traffic stop.

---

[2] Washington Crime Information Center.

2

After he activated his overhead lights and Ms. Creed pulled into a nearby parking space, Officer Ramos realized that he had misread the plate number. While Ms. Creed waited in her car at the officer's direction, he ran the correct plate number and learned that she was not, in fact, driving a car with stolen plates. He approached Ms. Creed's driver's side door to inform her of his mistake and tell her she was free to go.

As he approached, however, he saw Ms. Creed toss an item behind her driver's seat. He could not tell what it was. When he reached her door, he used his flashlight to illuminate the inside of her car. With the aid of his flashlight, he recognized the item on the floor behind her seat as a "'tar like' substance[ ]" inside small baggies, which appeared to be heroin. Clerk's Papers (CP) at 81. He placed Ms. Creed under arrest for possession of a controlled substance.

After Officer Ramos advised Ms. Creed of her *Miranda*[3] rights, she admitted that the substance in her car was heroin. She later consented in writing to a search of her car and officers seized the heroin. A later inventory search of Ms. Creed's purse produced two loaded syringes. Ms. Creed was charged with one count of possession of a controlled substance—heroin—under RCW 69.50.4013(1).

Ms. Creed moved to suppress the heroin seized arguing, first, that the traffic stop was unlawful because "the only basis for the stop was based on the officer's unreasonable

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

3

mistake of fact," and therefore "[a] reasonable suspicion of criminal activity did not exist" at the time of the seizure. CP at 2. Second, she argued that, even if the initial stop was justified, "the officer exceeded the [scope] of any permissible stop by continuing to detain Ms. Creed after the officer realized his mistake." *Id.*

The trial court granted the motion to suppress and dismissed the case. While finding that the officer's mistake was made in "good faith," it also found that the mistaken reading of the license plate was "[t]he sole reason for the initial stop of Ms. Creed's vehicle." CP at 81. The court further found that even after learning that he had entered the wrong plate number, the officer continued to engage in investigatory acts without lawful authority. It concluded that "[t]he officer's mistaken reading of the license plate did not provide a reasonable articulable suspicion, based on objective facts that Ms. Creed had committed a violation of the law," that his "good faith mistake does not provide a basis for the traffic stop," and that "[t]here is no exception to the exclusionary rule which would permit the court to find that there was a break in the series of events which would cleanse the taint of the initial unlawful stop of the vehicle." *Id.*

The State appeals.[4]

---

[4] Although Ms. Creed filed a notice of cross appeal, she is not an aggrieved party and appears to have abandoned the issue in her brief.

4

## ANALYSIS

### I.   Reasonableness of the *Terry* Stop

Based on the holding in *Snapp* that "the question of a valid stop does not depend upon [a driver's] actually having violated the statute[; r]ather, if [the officer] had a reasonable suspicion that he was violating the statute, the stop was justified," the State argues that Officer Ramos reasonably suspected a violation, and Ms. Creed's motion to suppress should have been denied.  174 Wn.2d at 198.  The State carries the burden of showing that a particular search or seizure falls within one of the exceptions to the warrant requirement.  *State v. Duncan*, 146 Wn.2d 166, 172, 43 P.3d 513 (2002) (citing *State v. Williams*, 102 Wn.2d 733, 736, 689 P.2d 1065 (1984)).  It is only the trial court's conclusions of law that the State asks us to review, so our review is de novo.  *State v. Phillips*, 126 Wn. App. 584, 109 P.3d 470 (2005).

The Washington Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."  CONST. art. I, § 7.  A vehicle stop, "although less intrusive than an arrest, is nevertheless a seizure and therefore must be reasonable under the Fourth Amendment and article 1, section 7 of the Washington Constitution."  *State v. Kennedy*, 107 Wn.2d 1, 4, 726 P.2d 445 (1986) (citing *Terry*, 392 U.S. 1; *State v. Lesnick*, 84 Wn.2d 940, 530 P.2d 243 (1975); *Davis v. Mississippi*, 394 U.S. 721, 89 S. Ct. 1394, 22 L. Ed. 2d 676 (1969)).

5

"A *Terry* investigative stop only authorizes police officers to briefly detain a person for questioning without grounds for arrest if they reasonably suspect, based on 'specific, objective facts,' that the person detained is engaged in criminal activity or a traffic violation." *State v. Day*, 161 Wn.2d 889, 896, 168 P.3d 1265 (2007) (citing *Duncan*, 146 Wn.2d at 172-74 (citing *Terry*, 392 U.S. at 21)). To satisfy the reasonable suspicion standard, the officer's belief must be based on objective facts. Charles W. Johnson & Debra L. Stephens, *Survey of Washington Search and Seizure Law: 2013 Update*, 36 SEATTLE U. L. REV. 1581, 1681 (2013) (citing *State v. Acrey*, 148 Wn.2d 738, 747, 64 P.3d 594 (2003); *State v. Seitz*, 86 Wn. App. 865, 869-70, 941 P.2d 5 (1997)).

This "objective basis," or "reasonable suspicion," must consist of "'specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'" *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000) (quoting *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996)). "Each individual possesses the right to privacy, meaning that person has the right to be left alone by police unless there is probable cause based on *objective facts* that the person is committing a crime." *State v. Grande*, 164 Wn.2d 135, 141, 187 P.3d 248 (2008) (emphasis added).

In *Snapp*, there were objective facts correctly recognized by the arresting officer (time of year, time of day, how dark it was) from which he could reasonably, even if mistakenly, infer that it was the time by which drivers should have turned on their

6

headlights. The officer understandably did not know exactly what time the sun set on the day in question, and he proved to be incorrect in believing that he stopped the driver 30 minutes after sunset. Yet his suspicion was still reasonable based on the objective facts that he correctly perceived.[5]

Suppose, however, it had been a clear day in late June, the officer again was understandably unaware of the exact time for sunset (8:31 p.m., it would turn out), and based on mistakes on his part about objective circumstances, he stopped a driver for an unilluminated headlight violation at 7 p.m. In this second case, the officer's suspicion of a statutory violation would be unreasonable. As the example illustrates, the outcome in *Snapp* depended not on the officer's good faith yet unreasonable inference from objective facts; it depended on his ability to point to objective facts supporting his reasonable but mistaken suspicion. An officer's suspicion, even if mistaken, must still be reasonable in light of the objective reality with which he or she is presented.

In asking us to extend *Snapp* by concluding that an officer's reasonable suspicion can be based on his or her own innocent mistakes, the State is essentially asking us to factor good faith into the reasonable suspicion analysis. Settled law has rejected good faith as a factor. As a leading treatise on search and seizure law has observed, in

---

[5] *Snapp* further recognizes that "the headlight statute also provides that headlights must be on 'at any other time when, due to insufficient light or unfavorable atmospheric conditions, persons and vehicles on the highway are not clearly discernible at a distance of one thousand feet ahead.'" 174 Wn.2d at 198 (quoting RCW 46.37.020).

discussing *Terry* stops:

> Certainly it is clear beyond question that the *"reasonable* belief" required
> for arrest is not to be determined by what the arresting officer did or did not
> believe, but rather by whether the available facts would "warrant a man of
> reasonable caution in the belief" that the person arrested had committed an
> offense.

4 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT

§ 9.5(a), at 646 (5th ed. 2012). And in *State v. Afana*, 169 Wn.2d 169, 179-80, 233 P.3d

879 (2010), our Supreme Court refused to recognize a different sort of "good faith"[6] as an

exception to the exclusionary rule.

Extending *Snapp* on the facts presented here would elevate the innocence or

culpability of an officer over the real concern of article I, section 7: the right of citizens to

be protected from unwarranted invasions and intrusions. As our Supreme Court

explained in *Day*, "[w]e suppress [unlawfully seized] evidence not to punish the police,

*who may easily have erred innocently.* We suppress unlawfully seized evidence because

we do not want to become knowingly complicit in an unconstitutional exercise of power.

*See generally Olmstead v. United States*, 277 U.S. 438, 484-85, 48 S. Ct. 564, 72 L. Ed.

944 (1928) (Brandeis, J., dissenting)." 161 Wn.2d at 894 (emphasis added).

---

[6] The "good faith" that the State advanced as an exception to the hearsay rule in
*Afana* was an officer's objectively reasonable reliance on something that appeared to
justify a search or seizure when it was made, such as a statute or search warrant that later
proved invalid. Good faith of that sort is recognized as an exception to the federal
exclusionary rule for evidence seized in violation of the Fourth Amendment. *Afana*, 169
Wn.2d at 179-80.

8

This means that while police may sometimes *reasonably* rely on incorrect information provided by third parties, they may not *reasonably* rely on their own mistaken assessment of material facts. *See, e.g., State v. Mance,* 82 Wn. App. 539, 918 P.2d 527 (1996) (holding that police may not rely upon information that is incorrect or incomplete through their fault); *State v. O'Cain,* 108 Wn. App. 542, 31 P.3d 733 (2001) (holding that a police dispatch indicating vehicle driven by defendant had been reported stolen did not provide reasonable suspicion for investigatory stop); *State v. Sandholm,* 96 Wn. App. 846, 848, 980 P.2d 1292 (1999) (noting that "exclusive reliance on the WACIC stolen vehicle report would not have provided sufficient basis for the State to establish probable cause to arrest"); *cf. State v. Gaddy,* 152 Wn.2d 64, 71, 74, 93 P.3d 872 (2004) (distinguishing officers' right to rely on erroneous license information from Department of Licensing, which is not a police agency and whose information is presumptively reliable, from information subject to the "fellow officer rule").

Under the exclusionary rule, "[i]f the initial stop was unlawful, the subsequent search and fruits of that search are inadmissible as fruits of the poisonous tree." *Kennedy,* 107 Wn.2d at 4 (citing *Wong Sun v. United States,* 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)). The trial court properly granted the motion to suppress.

II. The Attenuation Doctrine as an Alternative Justification

It was, of course, reasonable for Officer Ramos to approach Ms. Creed, explain his actions, and tell her she was free to go once he realized his mistake. Contrary to the

9

argument of the State, his observation of baggies of a tar-like substance on the floor of

the backseat before sending her on her way does not provide an independent basis for

admitting the evidence.

In *State v. Penfield*, 106 Wn. App. 157, 159, 22 P.3d 293 (2001), an officer

stopped the defendant after he ran a check on the license plate number of the car he was

driving and found that the license of the registered owner—a woman—was suspended. It

was as the officer approached the car that he first realized the driver was male.

Nevertheless, the officer asked the driver for his license. This court ruled that the stop

was unlawful, noting that the officer

> could not point to any articulable suspicion of criminal activity on the part
> of [the driver], once it became evident that he was not the registered owner
> of the vehicle. The fact the registered owner was a woman and the fact the
> driver here was a man indicated conclusively to Officer Vaughn that the
> driver was not the person who the Department of Licensing had reported as
> having a suspended license.

*Id.* at 161. As this court later explained in *Phillips*, "an officer may not, without

additional grounds for suspicion, proceed with a stop based on a registration check once

it is manifestly clear that the driver of the vehicle is *not* the registered owner." 126 Wn.

App. at 588.

Similar facts were present in *State v. Chatton*, 11 Ohio St. 3d 59, 463 N.E.2d 1237

(1984), which both parties cite in their briefs. In that case, police stopped a vehicle

because it had neither a front nor a back license plate. As the officer approached the

10

vehicle, he noticed a temporary license plate beneath the rear window, which was consistent with state law. The question in *Chatton* was whether the police officer had "continuing justification to detain [the driver] and demand production of his driver's license" once the officer observed the temporary tags in the rear of the vehicle. *Id.* at 60-61. The Ohio Supreme Court held that he did not.

This is not to say that Officer Ramos was required to "simply drive off without explanation once suspicion had been dispelled, leaving the driver to wonder what had occurred," as facetiously suggested by the State. Br. of Appellant at 11. *Phillips* recognized that in the case of a vehicle stop based on the revoked or suspended license of a vehicle's owner, an officer can detain the driver long enough to dispel suspicion that he or she is the registered owner. 126 Wn. App. at 588. *Chatton* observed that "as a matter of courtesy, [the officer] could have explained to [the driver] the reason he was initially detained" and sent him on his way. 11 Ohio St. 3d at 63. That sort of momentary, entirely noninvestigative contact would have been reasonable here, too. What *Chatton* held the officer could not do, and what was unlawful here, was to "unite [a] search" to that courtesy contact—in *Chatton*, by asking the driver to produce his driver's license. *Id.*

Here, the trial court found that after Officer Ramos realized he had no reasonable suspicion justifying Ms. Creed's detention, he took a number of actions inconsistent with what would have been the clearly permissible course of action of promptly telling her she

11

was free to leave. Instead, after realizing his mistake, the officer "ordered the driver . . . to remain in the vehicle"; "held her there for several seconds while he checked the proper license plate number"; "never turned off the overhead lights on his patrol vehicle"; and "with the aid of his flashlight, looked at the [unrecognizable item he had seen her toss into the backseat floor] from his position outside the vehicle," determining at that point that it was heroin. CP at 81. The State does not challenge these findings, which are verities on appeal. *State v. Valdez*, 167 Wn.2d 761, 767, 224 P.3d 751 (2009).

Under *Penfield* and *Phillips*, Officer Ramos lacked lawful authority to proceed with these actions once he realized that he lacked reasonable suspicion for the stop. The fruits of his improper conduct were, again, properly excluded by the trial court.

Affirmed.

_____
Siddoway, J.

I CONCUR:

_____
Kulik, J.P.T.

12

30893-6-III

KORSMO, C.J. (dissenting) — The majority nicely analyzes why the stop in this case is invalid and I agree with that portion of the opinion. An officer cannot manufacture probable cause through negligence. That said, I disagree with the conclusion that the evidence Joanne Creed tossed away in front of the officer was the fruit of the stop. As there was no exploitation of the illegality, the exclusionary rule has no application here. I would reverse and remand this matter for trial.

When illegal police behavior directly leads to evidence of a crime, the evidence will be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 485-86, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). However, when the evidence is not directly the fruit of the police illegality, but merely follows after it in time, the evidence need not be excluded. *Id.* at 491-92. This is known as the attenuation doctrine. *Id.* at 491 (citing *Nardone v. United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939)).

Washington likewise excludes evidence that is directly discovered as a result of police violation of article I, section 7. *State v. Bonds*, 98 Wn.2d 1, 9, 653 P.2d 1024 (1982). Washington has repeatedly rejected a "but for" test of causation that would require the suppression of any evidence discovered subsequent to an illegality. *E.g.*,

*State v. Mierz*, 127 Wn.2d 460, 474-75, 901 P.2d 286 (1995) (declining to suppress evidence of defendant's assault on officers following unlawful entry); *Bonds*, 98 Wn.2d at 10-14 (declining to suppress confession following illegal arrest and return from Oregon where officers had probable cause to make arrest); *State v. Vangen*, 72 Wn.2d 548, 554-55, 433 P.2d 691 (1967) (declining to suppress confession following allegedly improper arrest).

Officer Gabe Ramos did not exploit his mistake; instead, Ms. Creed made her own mistake by tossing the heroin to the backseat in his presence, putting it in open view. The officer simply walked to the car to tell her that he had erroneously stopped the vehicle when Ms. Creed acted. These facts are totally unlike those of the cases the majority relies upon—*State v. Penfield*, 106 Wn. App. 157, 22 P.3d 293 (2001), and *State v. Chatton*, 11 Ohio St. 3d 59, 463 N.E.2d 1237 (1984). As noted by the majority, in each of those cases the officer exploited the erroneous traffic stop by requesting and receiving the driver's license, checking on the driver's status, and then acting upon information about the driver's status.

There was no such exploitation here. The officer stopped the car and told Ms. Creed to remain in it. He then discovered his mistake and typed in the correct license number in order to determine the status of the vehicle. He then went to tell the driver of

2

the error and that she was free to go. Ms. Creed, however, decided to try and dispose of the heroin. Officer Ramos did not err in using his flashlight to identify the substance she threw away in his presence. The evidence was not discovered by the officer's actions. The only thing the officer arguably did wrong after realizing that he had typed in the wrong license plate number was to check the actual plate number before telling Ms. Creed that she could leave. The apparently brief[1] delay there preceded Ms. Creed's actions but it did not cause them.

Ms. Creed voluntarily threw the heroin; nothing the officer did required or encouraged her to expose the substance. Once she did expose it, the officer did nothing wrong in shining his light to confirm the identity of the item. He was in a place he had a right to be and simply responded to her action—and he did all of it while walking up to talk to her.

Ms. Creed's voluntary action in response to the officer's mistake was not the fruit of that mistake. This case is no different than if Ms. Creed had assaulted the officer as occurred in *Mierz*. The officer may have made the first mistake, but he did not cause her to take action. She made that choice herself.

---

[1] The officer testified that it took only two minutes from the traffic stop to the discovery of the heroin.

3

The heroin was not discovered by the officer exploiting the erroneous traffic stop.

Accordingly, the suppression ruling should be reversed and the matter remanded for trial.

I respectfully dissent from the majority's contrary conclusion.

_____
Korsmo, C.J.

4