IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>      Respondent,<br><br>      v.<br><br>CHRISTOPHER A. NIELSEN,<br><br>      Appellant. | No. 86402-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — Christopher Nielsen was convicted of unlawful possession of a firearm in the first degree, possession of a stolen motor vehicle, and possession of methamphetamine with intent to deliver after entry of his plea pursuant to *North Carolina v. Alford*.[1] Despite his plea and the court's imposition of a standard range sentence, he challenges the denial of his pretrial motion to suppress evidence and dismiss his charges based on a reservation of that right, which the trial court accepted, as explicitly set out in his statement of defendant on plea of guilty. He avers that the trial court improperly declined to suppress evidence derived from an illegal stop, as well as the later intrusion of officers onto the property where he lived. We agree as to the former argument and reverse.

FACTS

Island County Sheriff's Office (ICSO) Deputy Shawn Engert stopped a blue Chevrolet Cavalier driven by Nielsen in the early hours of January 23, 2023.

---

[1] 400 U.S. 25 (1970).

Engert had run the vehicle's license plate before the stop, which he read as "AMA7065." The return on the license plate number that Engert searched indicated that it belonged to a brown Chevrolet Impala with an expired registration. Engert later stated that the "vehicle did not appear to match the return from the license plate." After Engert activated his lights and blocked the car, Nielsen complied with instructions to turn off the car and exit the vehicle. Engert was familiar with Nielsen from "previous law enforcement contacts" and asserted in the report he later issued for this contact that he knew Nielsen "to be a convicted felon who will often flee or fight" and that Nielsen was "known [by law enforcement] to possess firearms." As an officer safety measure based on that information, Engert placed Nielsen into handcuffs after he exited the vehicle, patted him down for weapons, and secured him in the back of his patrol vehicle while he continued to investigate.

However, Engert then realized that he had misread the license plate; it was not "AMA70*6*5," but "AMA70*5*5." Engert ran the license plate again, this time with the correct number, and it returned a blue Chevrolet Cavalier that matched the vehicle Nielsen was driving. The search results further indicated that the vehicle was registered to "Patrick Nelson."[2] Engert also learned that Nielsen had an active Department of Corrections (DOC) warrant for escaping community custody, presumably by running Engert through dispatch for wants and warrants.[3]

---

[2] The record suggests this was a typographical error in Engert's report and that the correct name of the registered owner was Patricia Nelson.

[3] Engert's report does not describe how he learned about the warrant but simply asserts that Nielsen had one. However, Engert further notes that DOC confirmed the warrant, which is strongly suggestive that he was in communication with dispatch, who would have contacted DOC to confirm that the warrant was still active.

However, the Island County Jail declined to accept Nielsen on the warrant. Engert also learned that Nielsen's driver license was suspended, so while Engert released him from the contact, he did issue Nielsen a citation for driving with a suspended license in the third degree (DWLS3).[4] Nielsen would later assert in his motion to suppress that it was during this latter portion of the stop that Nielsen told Engert he was staying a property on Great Dane Lane.[5]

On January 25, Patricia Nelson called the Oak Harbor Police Department (OHPD) to report that her car, a blue Chevrolet Cavalier, had been stolen. OHPD Officer Keith Kretchman, responded to the call and spoke with Nelson. He also accessed the law enforcement database "Spillman" and found an entry from Engert's contact with the vehicle and Nielsen two days prior. Kretchman contacted ICSO later that day to inquire about Engert's contact with Nielsen on January 23. Kretchman informed ICSO Deputy Timothy Davison that OHPD would be listing the vehicle Engert had stopped as stolen and provided the case number. Davison contacted Engert who told him that Nielsen "may be staying at a location associated [with an unrelated party] on Great Dane Lane." Davison then requested that Sergeant Grant Walker and Deputy Laurrin Bates drive to the identified property on Great Dane Lane to look for the car.

---

[4] We use the common abbreviation for the simple misdemeanor crime of driving while license invalidated in the third degree. RCW 46.20.342. Previous versions of the statute referred to the crime as driving with license suspended or revoked (DWLS), and the acronym remains in use by many criminal law practitioners and law enforcement officers despite the change to the title of the relevant statute. *See* former RCW 46.20.342 (1998).

[5] While Engert's report on the DWLS citation indicates that his body worn camera was operative at the time of the stop and captured the contact with Nielsen, and that it was "uploaded into the evidence management system," it does not appear to have been admitted in the proceedings in the trial court, nor was it transmitted to this court in the record on appeal.

After handling another matter, Walker and Bates drove to the address on Great Dane Lane. To access this property, the officers had to first drive a mile up Witte Way, a private drive that connects to State Route 525. As the officers drove up Witte Way, they passed mailboxes and through an open gate. Photographs admitted into evidence depict this gate as having a number of highly visible signs on the posts on either side it that read "Private Drive," "No Trespassing" and "Private Property Keep Out." Walker would later testify that this gate was always open when he had visited Witte Way in the past. There was yet another gate with a "No Trespassing" sign at the entrance to Great Dane Lane from Witte Way. Walker later testified that "the gate [on Great Dane Lane] appears to be just north of Witte Way a little ways off the road, I would say a matter of, I don't know, 20, 30 feet," and the gate was open when he and Bates arrived at the property on January 25. He further stated that he had been to the property on official business "probably less than a week prior" and the "gate would have been open" during that earlier visit as he was "unhindered in driving on the property."

In his later testimony, Walker explained that he and Bates drove up Great Dane Lane to a cleared section of the property, which held what Walker described as several residences.[6] The blue Chevrolet Cavalier bearing the license plate AMA7055 was parked in the driveway. Walker stated that he and Bates approached the vehicle, which was running, and observed Nielsen asleep in the

---

[6] The court noted in its oral ruling that the testimony was that there were not any structures on the Great Dane Lane property, but rather trailers, campers, and vehicles where people lived.

The court then proceeded to engage in significant discussion of curtilage vis-à-vis one's residence and appeared to treat the land around these vehicles as curtilage. Though we are able to resolve this appeal on other grounds, in the absence of any case law recognizing curtilage in the context of vehicular residences, we note the legal error in the trial court's conclusion on this matter.

- 4 -

driver's seat. Nielsen was the sole occupant of the vehicle. Walker testified that the deputies woke Nielsen, informed him that there was a warrant for his arrest, arrested him on authority of that warrant, and placed him in handcuffs. A search of his person incident to arrest uncovered a .40 caliber pistol in a shoulder holster.

The blue Chevrolet Cavalier was identified as the one Nelson had reported stolen based on the vehicle identification number and the unique features of the car. Walker spoke with Kretchman from the scene. Kretchman then contacted Nelson and, as the registered owner, she gave officers permission to search the vehicle. Deputies who conducted the search located "small plastic baggies filled with suspected methamphetamine, heroin, and a digital scale covered in suspected methamphetamine residue." Walker transported Nielsen to the Island County Jail where he was booked on an investigative hold for possession of a stolen motor vehicle, unlawful possession of a firearm in the first degree (UPF1), possession of methamphetamine with intent to deliver (PWI—methamphetamine), and introducing contraband in the second degree.[7]

On January 30, the State charged Nielsen with UPF1, possession of a stolen motor vehicle, and PWI—methamphetamine. In June, Nielsen sought and was granted leave to represent himself, although he was appointed standby counsel the following month. In July, Nielsen filed a motion to dismiss on the basis that the State's information did not accurately reflect his criminal history, and thus,

---

[7] The introducing contraband allegation was based on a single .40 caliber bullet found in Nielsen's pocket, after he had been advised of contraband restrictions at booking and affirmatively disclaimed that he had any such items on his person.

The record is unclear as to whether Nielsen was also booked on the DOC warrant on which he had been arrested.

the predicate offense alleged by the State did not support the UPF1 charge. The State conceded that its description of Nielson's prior offense was "partially inaccurate" and filed an amended information that changed the predicate offense for the UPF1 to a burglary conviction.[8]

Nielsen filed a motion to suppress at the end of August.[9] He argued that the stop by Engert on January 23 was an unlawful seizure, the incident that resulted in his arrest at Great Dane Lane on January 25 involved both an unlawful seizure and search, and both of these law enforcement contacts violated his constitutional rights. He specifically moved for the trial court "to suppress all primary evidence as well as derivative evidence which was obtained as a result of (1) an unlawful seizure which took place on 1-23-23, and (2) an unlawful search and seizure which took place on 1-25-23." Nielsen attached reports from Engert, Davison, and Walker, as well as maps and photos of the approach to Great Dane Lane from Witte Way and of the site itself. The State's response followed in early September and averred, as to the contact on January 25, that Walker and Bates had discovered Nielsen in the car from "a non-intrusive vantage point" that did not amount to a search. The State also asserted that Engert had reasonable suspicion to stop the vehicle on January 23 and Engert's stop was "not relevant to the admissibility of evidence" collected two days later at Great Dane Lane. The only

---

[8] It is unclear from this record which specific conviction for burglary in the second degree the State used as the predicate, as Nielsen's criminal history reflects six separate convictions for this crime under various Island County Superior Court cause numbers between 2003 and 2004. However, any one of these convictions would satisfy that element of a UPF1.

[9] Nielsen filed a petition for a writ of habeas corpus in the trial court earlier in August and moved for the court to "forward a petition to the Washington Supreme Court for review and consideration." The State noted that the trial court was authorized to rule on the petition and urged the court to deny it on the basis that the proper tool for addressing Nielsen's concerns was a motion to suppress. The trial court agreed and denied Nielsen's petition.

witness who appeared at the hearing conducted on September 21 was Walker, whose testimony was introduced by the State. Nielsen cross-examined Walker solely on the contact at Great Dane Lane. Both parties agreed to the admission of Engert's report at the hearing. After considering the argument of the parties, the court orally denied the motion to suppress and directed the State to prepare written findings of facts and conclusions of law (FFCL) in support of its ruling for entry at a later date. Like the court's oral ruling, the FFCL that were entered on October 9 do not include any analysis of the propriety of the January 23 traffic stop, nor any findings or conclusions about that contact despite Nielsen's explicit argument in his written motion that the January 23 stop was the sole basis of the contact on January 25 that resulted in his arrest.

After the court's determination of his suppression motion, Nielsen elected to change his plea based in part on the State's further amendments to the charging document. In March 2024, he entered an *Alford* plea to the original charges and, by agreement with the State, explicitly reserved the right to appeal the denial of his suppression motion. Despite the fact that the negotiated resolution involved an agreement to a usually unappealable standard range sentence upon entry of a plea that admitted the risk of conviction based on the facts in the record, the State expressly agreed to the preservation of Nielsen's right to appeal the denial of the suppression motion. The State made these affirmative statements orally at the entry of the plea and in writing in the plea form itself; the trial court referenced and accepted the agreement during the hearing on plea and sentence. The judge sentenced Nielsen to a total term of confinement of 87 months in prison, the low

end of the sentencing range on the UPF1 conviction (and slightly above the midrange on the PWI—methamphetamine conviction), followed by 12 months of community custody after his release from prison.

Nielsen timely appealed.

ANALYSIS

I.     Appealability

We first take this opportunity to address appealability.  The state constitution provides that criminal defendants have a right to an appeal.  WASH. CONST. art. I, § 22.  "Even a defendant who plead guilty retains a limited right to an appeal." *State v. D.G.A.*, 25 Wn. App. 2d 860, 864, 525 P.3d 995 (2023), *review denied*, 1 Wn.3d 1031 (2023).  "A voluntary guilty plea, however, acts as a waiver of the right to appeal."  *Id.*  Further, RCW 9.94A.585(1) plainly establishes that a "sentence within the standard sentence range . . . for an offense shall not be appealed."

Here, Nielsen voluntarily entered a plea pursuant to *Alford*, as to the charges for UPF1, possession of a stolen vehicle, and PWI—methamphetamine.  By signing the plea form, he affirmatively accepted the preprinted language which asserted that he understood he was waiving the "right to appeal a finding of guilt after trial" and that his right to appeal would be limited.  But handwritten on the plea form, in the part set aside for the defendant's statement, was the notation: "I am reserving my right to appeal the denial of my motions in this case."  The State explicitly agreed to this reservation of right both by signing the plea form and by making an affirmative statement to that effect at the plea hearing.  The prosecutor noted, "I know that he's—he's entering the *Alford* plea in order to preserve the—

the opportunity to appeal the three—Criminal Rule 3.6 decision that was made earlier in the case. And that's fine." Irrespective of the controlling case law on appealability and the plain language of RCW 9.94A.585(1), the court acknowledged and appears to have accepted this agreement. Further, the State's response brief specifically concedes, as it must on this record, that "the State has, therefore, waived an objection to Nielsen's appeal of the trial court's decision on his pretrial motion to suppress evidence." Ordinarily, entry of a plea that admits the strength of the State's evidence waives any subsequent challenges to that evidence, which raises significant questions about the parties' agreement to the contrary. Nonetheless, we turn to the merits.

II.    Improper Denial of Motion to Suppress

Motions to suppress evidence are generally governed by CrR 3.6.[10] Our review begins with examination of the findings of fact to determine if substantial evidence supports denial of the motion to suppress. *State v. Bliss*, 153 Wn. App. 197, 203, 222 P.3d 107 (2009). Unchallenged findings of fact are verities on appeal. *State v. Gibson*, 152 Wn. App. 945, 951, 219 P.3d 964 (2009). We review the conclusions of law supporting a trial court's denial of a motion to suppress de novo. *State v. Reis*, 180 Wn. App. 438, 442, 322 P.3d 1238 (2014), *aff'd*, 183 Wn.2d 197, 351 P.3d 127 (2015). "A trial court's erroneous determination of facts, unsupported by substantial evidence, will not be binding on appeal." *State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994).

---

[10] The notable exception is a motion to suppress certain statements of the accused, which is governed by CrR 3.5.

Our state constitution provides, "No person shall be disturbed in [their] private affairs, or [their] home invaded, without authority of law." WASH. CONST. art 1, § 7. This section enshrines in our state a robust privacy right, greater than that provided by the Fourth Amendment to the United States Constitution. *State v. Flores*, 186 Wn.2d 506, 512, 379 P.3d 104 (2016); U.S. CONST. amend. IV. "'As a general rule, warrantless searches and seizures are per se unreasonable,'" and in violation of both the Washington and United States Constitutions. *State v. Russell*, 180 Wn.2d 860, 867, 330 P.3d 151 (2014) (quoting *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009)). The exceptions to the warrant requirement are "'jealously and carefully drawn.'" *Garvin*, 166 Wn.2d at 249 (internal quotation marks omitted) (quoting *State v. Duncan*, 146 Wn.2d 166, 171-72, 43 P.3d 513 (2002)). "The State bears a heavy burden in showing the search falls within one of these exceptions." *State v. Jones*, 146 Wn.2d 328, 335, 45 P.3d 1062 (2002). "The State must establish an exception to the warrant requirement by clear and convincing evidence." *Garvin*, 166 Wn.2d at 250. Any evidence that has been obtained in violation of the law must be suppressed as mandated by this exclusionary rule. *State v. Eisfeldt*, 163 Wn.2d 628, 639-40, 185 P.3d 580 (2008). Our State Supreme Court has repeatedly rejected the notion of a "good faith" exception to the exclusionary rule. *See State v. Eserjose*, 171 Wn.2d 907, 927, 259 P.3d 172 (2011) (plurality opinion). Rather, it has expressly held that Washington's exclusionary rule is "'nearly categorical.'" *Id.* at 913 (quoting *State v. Winterstein*, 167 Wn.2d 620, 636, 220 P.3d 1226 (2009)).

The investigative stop, though, is a long-recognized exception to the warrant requirement. *See Terry v. Ohio*, 392 U.S. 1 (1968). A law enforcement officer may stop a vehicle, thus seizing its occupants, if they have a "reasonable suspicion, grounded in specific and articulable facts, that the person stopped has been or is about to be involved in a crime." *State v. Acrey*, 148 Wn.2d 738, 747, 64 P.3d 594 (2003). When reviewing the justification supporting the stop, we consider the totality of the circumstances. *State v. Snapp*, 174 Wn.2d 177, 198, 275 P.3d 289 (2012). If a person has been unlawfully seized, however, "'[no] subsequent events or circumstances can retroactively justify [the] stop.'" *State v. Butler*, 2 Wn. App. 2d 549, 563, 411 P.3d 393 (2018) (alterations in original) (quoting *State v. Z.U.E.,* 178 Wn. App. 769, 780, 315 P.3d 1158 (2014), *aff'd,* 183 Wn.2d 610, 352 P.3d 796 (2015)). The process of checking for outstanding warrants even during a stop later determined to be unlawful conforms with "reasonable routine police procedures." *State v. Madrigal*, 65 Wn. App. 279, 283, 827 P.2d 1105 (1992). Again, such proper investigatory steps cannot retroactively validate or sanitize an improper seizure, and there is no "good faith" exception to these rules. *Butler*, 2 Wn. App. 2d at 563; *Eserjose*, 171 Wn.2d at 927.

A related evidentiary concept, highly relevant here, is that of the "fruit of the poisonous tree," under which "evidence derived from an illegal search may also be subject to suppression." *State v. Gaines*, 154 Wn.2d 711, 717, 116 P.3d 993 (2005); *Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963). "[T]he attenuation doctrine defines the parameters of the 'fruit of the poisonous tree' doctrine. Evidence is not 'fruit of the poisonous tree' if the connection between the

challenged evidence and the illegal actions of the police is 'so attenuated as to dissipate the taint.'" *Eserjose*, 171 Wn.2d at 921 (quoting *Wong Sun*, 371 U.S. at 487.). Attenuation is satisfied "only if, an unforeseeable intervening act genuinely severs the causal connection between official misconduct and the discovery of evidence." *State v. Mayfield*, 192 Wn.2d 871, 898, 434 P.3d 58 (2019). If the State cannot meet this burden, then it cannot benefit from the attenuation exception. *Id.* at 883. The independent source exception is a related doctrine and allows that "evidence tainted by unlawful governmental action is not subject to suppression . . . provided that it ultimately is obtained pursuant to a valid warrant or other lawful means." *Gaines*, 154 Wn.2d at 718. If the State relies on this exception in its opposition to a defense motion to suppress, it must affirmatively establish that "the subsequent search is based on untainted independently obtained information, and the State's decision to search is not motivated by the previous unlawful search or seizure." *State v. Smith*, 165 Wn. App. 296, 310, 266 P.3d 250 (2011), *aff'd,* 177 Wn.2d 533, 303 P.3d 1047 (2013).

A.      Engert's January 23 Traffic Stop Was Unlawful

With this legal framework in mind, we turn to the record before us on appeal. Nielsen does not challenge any of the findings of fact related to this issue because the order denying his motion to suppress did not address the vehicle stop on January 23. At oral argument before this court, Nielsen stated that the omission of the January 23 stop from the trial court's order demonstrates the State's failure

to meet its burden at the hearing on the motion to establish its legality.[11]  Nielsen focuses his briefing on the State's misrepresentation at the motion hearing of the holding of *State v. Creed*, 179 Wn. App 534, 319 P.3d 80 (2014).  In its response to Nielsen's motion to suppress, the State relied on *Creed* to assert that while "an officer may not continue in investigatory acts after learning of his mistake," the officer is still permitted to "detain a driver long enough to dispel his original suspicion."  In briefing on appeal, the State maintains its position that even after a stop has been "improperly initiated," the "officer may detain the driver long enough to dispel suspicion," although it also concedes that the January 23 stop was "arguably unlawful."  The State's argument here fails to meaningfully address the core issue: the connection of that "arguably unlawful" stop on January 23, the information gained from that contact, and Nielsen's arrest at Great Dane Lane on January 25.  Underpinning our examination of this question is the State's burden to prove that an exception to the warrant requirement applies here such that suppression of the improperly obtained evidence was not required.  *See Jones*, 146 Wn.2d at 335; *Garvin*, 166 Wn.2d at 250; *Eisfeldt*, 163 Wn.2d at 635.  This is particularly critical in light of our State Supreme Court's clear holding that there is no "good faith" exception to the exclusionary rule and the exclusionary rule is to be applied in a nearly categorical manner.  *Eserjose*, 171 Wn.2d at 927, 913.

Engert's initial suspicion that led to his stop of Nielsen on January 23 was reasonable.  Engert's first search of the license plate, using the wrong number

---

[11] Wash. Ct. of Appeals oral arg., *State v. Nielsen*, No. 86402-5-I (May 28, 2025), at 7 min., 50 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2025051193.

based on misreading it, returned information on a vehicle that did not match the one he observed. This mistake provided reasonable suspicion that the license plate had been switched, which could have suggested it was a stolen vehicle. However, that suspicion was later dispelled when Engert ran the license plate for a second time with the correct number and discovered that it matched the car on the scene. At that point, the stop was no longer justified.

Complicating the analysis here, Engert recognized Nielsen from previous law enforcement contacts and knew certain facts about him that supported a concern for officer safety, which made it reasonable to remove him from the car, handcuff him, and place him in the patrol vehicle while Engert ran a warrant check. *See State v. Kennedy*, 107 Wn.2d 1, 12, 726 P.2d 445 (1986). Engert then discovered that Nielsen's driving privileges were suspended and he had an active DOC warrant for his arrest. "Once an officer discovers the existence of an outstanding warrant for a person's arrest, the officer has a duty to arrest." *State v. Chelly*, 94 Wn. App. 254, 262, 970 P.2d 376 (1999). Engert attempted to carry out this duty, but the jail declined to accept Nielsen on the DOC warrant. Engert then properly issued the citation for the misdemeanor traffic violation and released Nielsen from the contact. What is glaringly absent from this record is the precise chronology of key facts: when Engert ran Nielsen for wants and warrants in relation to when he realized the mistake as to the license plate and, most critically, when and how he obtained the information associating Nielsen with the address at Great Dane Lane. Nielsen correctly emphasized at oral argument that this question of

- 14 -

timing is crucial.[12]  The State conceded that the report did not supply this chronology to the trial court and Engert's testimony "would have probably provided additional detail."[13]  However, despite the fact that it carried the burden to establish that a warrant exception applied, such that any evidence gained from the January 23 stop was lawfully obtained and not subject to suppression, the State failed to present Engert's testimony, or introduce his body cam footage of the contact, at the hearing on Nielsen's motion.

Evidence discovered after an unlawful stop cannot justify it retroactively, nor can such improperly obtained evidence be used to prolong a contact.  The State urges us to accept its interpretation of *Creed*.  It contends in briefing that *Creed* stands for an exception: "Even an officer who has improperly initiated a traffic stop is not required to simply drive off without explanation.  Instead an officer may detain a driver long enough to dispel suspicion." (Citations omitted.)  However, the State misreads *Creed*, twisting a very specific holding regarding suspicion of one type of driving offense into a general rule.  To be clear, *Creed* does not support prolonging a contact in order to dispel any and all suspicion of any possible criminal activity, despite the officer's realization that the initial stop was truly unjustified.  Instead, *Creed* simply provides that "in the case of a vehicle stop *based on the revoked or suspended license of a vehicle's owner*, an officer can detain the driver long enough to dispel suspicion that [they are] the registered owner."  179 Wn. App at 544-45 (emphasis added).  This reflects a precise set of circumstances that are not present here.  That alone renders the case sufficiently factually distinct from

---

[12] Wash. Ct. of Appeals oral arg., *supra*, at 7 min., 18 sec.
[13] *Id.* at 13 min., 13 sec. to 15 min., 29 sec.

the scenario presented in Nielsen's case that it is inapposite. The plain holding of *Creed* is simply that once an officer has realized they do not actually have reasonable suspicion that the crime of driving with a suspended license has occurred such that the initial detention was justified, because they have confirmed that the driver is not the suspended registered owner of the vehicle, the encounter must be limited to explaining that mistake and advising the seized person that they are free to go. *Id.*

Nielsen's application of *Creed* is also incorrect. Creed was stopped, like Nielsen, due to an officer's misreading of a license plate. However, one potential variation of Nielsen's stop, because we have no evidence of the actual chronology of the relevant events here, would have concluded with a determination by law enforcement that he was not immediately free to go as Creed had been: if Engert ran Nielsen for wants and warrants *before* learning of the mistake as to the license plate, he was duty bound to act on the DOC warrant. *Chelly*, 94 Wn. App. at 262. The fact of the active DOC warrant provided a separate basis to continue the stop until that duty was discharged, despite the initial mistake that triggered the initial contact. But, a basis to continue for a very specific purpose, executing the warrant, does not undo the initial mistake and does not cleanse the stop of illegality. *See Butler*, 2 Wn. App. 2d at 563. If Engert asked Nielsen where he was living *after* discovering his mistake as to the license plate, in the context of issuing the DWLS3 citation after the jail declined booking on the warrant, that information was "fruit of the poisonous tree," obtained as the result of an unlawful seizure and subject to suppression. *See Gaines*, 154 Wn.2d at 717; *Wong Sun*, 371 U.S. at 484-87. The

only way the State could have used that tainted information was to prove it would or could have obtained it through an independent source. *See Smith*, 165 Wn. App. at 310.

### B. The State Failed to Prove Attenuation or Independent Source

The question on review, then, is not whether the January 23 stop was unlawful or unduly prolonged, though it was,[14] but, rather, whether the evidence associating Nielsen with the address on Great Dane Lane that law enforcement obtained as a result of the improper stop on January 23 was relied on to locate Nielsen at that location on January 25 and, if so, whether the State carried its burden to establish by a preponderance that an exception to the warrant requirement applied or that it satisfied its burden under the independent source doctrine.

Nielsen plainly identifies this problem in briefing and contends "the prosecution provided no evidence of an independent source of Mr. Nielsen's address, let alone an independent source connecting him to the stolen car." (Emphasis omitted.) Nielsen further asserts that the State did not prove or attempt to prove attenuation; that officers would have looked for Nielsen at Great Dane Lane regardless of the information obtained from Engert's unlawful stop two days prior. He distills the issue as "the prosecution did not show that [the State's] actions in going to Mr. Nielsen's residence to look for the stolen car is disconnected from the unlawful stop of Mr. Nielsen in that car two days earlier." The State's briefing

---

[14] Again, the State properly conceded in its briefing on appeal that the January 23 stop by Engert was "arguably unlawful."

misses the mark and asserts that "the only fact of consequence obtained on January 23 was Dep. Engert's observation of Nielson in Patricia Nelson's car." Notably, the State's response to Nielsen's motion to suppress in the trial court also failed to address attenuation or independent source.

Nevertheless, the legal question does not center on Engert's observation of Nielsen in Nelson's car on January 23, his seizure of Nielsen as the result of his misreading of the license plate, or the later visit to Great Dane Lane. The evidentiary issue concerns the point where those events converge; the connective tissue between the unlawful seizure on January 23 and Nielsen's later arrest at the property on Great Dane Lane on January 25. The State has not acknowledged, much less met its burden to prove that officers would have investigated the property at Great Dane Lane on January 25 if Engert had not stopped Nielsen two days prior, either through attenuation or the independent source exception to the exclusionary rule. At the CrR 3.6 hearing, the State presented one witness, Walker, and its questions posed to him only superficially addressed the source of the "tip" from a fellow officer that led him to look for Nielsen at the Great Dane Lane property. At oral argument before this court, Nielsen asserted that the State failed to meet its evidentiary burden at the CrR 3.6 hearing to establish the legality of the January 23 stop, such that the information gained from that contact could be used to locate Nielsen on January 25, because it did not call Engert to testify.[15] Despite the fact that Nielsen's motion to suppress addressed both the January 23 stop and the January 25 arrest, the record establishes that the judge focused almost entirely

---

[15] Wash. Ct. of Appeals oral arg., *supra*, at 5 min., 15 sec.

on the curtilage issue that was a new area of the law to her. Neither party directed the trial court to the foundational or dispositive evidentiary questions or provided guidance regarding the applicable standard of review or which party carried the evidentiary burden.

Nielsen's pro se motion explicitly sought suppression of both the "primary" and "derivative evidence" obtained "as a result of [the] unlawful seizure which took place on 1-23-23." This motion described the circumstances of the stop, noted that it began with Engert's mistake as to the license plate number, and cited to Engert's own report as corroboration. Nielsen also relied on Davison's report to show that Engert is the one who provided Davison with the Great Dane Lane address and the information regarding the blue Chevrolet Cavalier. The following exchange between Nielsen and the trial court occurred during his argument after Walker's testimony:

> THE COURT: Then, Mr. Nielsen, now it's your turn. Take ten minutes, sir. I may budge in if I want to or need to, but this is your chance to present your argument.
>
> MR. NIELSEN: Okay. Well, Your Honor—
>
> THE COURT: And I'll just—you talk quickly. I think slowly. And I don't want to lose what you're saying. So if you will slow down just a little bit, I will do my best to follow your argument.
>
> MR. NIELSEN: Okay. Well, I don't really have much of an oral argument, honestly. I mean, I—you know, everything that I wanted to say has pretty much been put in my moving papers. You know, I wrote a motion. I included photographs. You know, I added case law. The State responded. I replied, you know, and I addressed the issues that he presented in his—his response.
> *So, you know, basically, I mean, everything's pretty much in the paperwork, you know. So, I mean, if you, you know, make a ruling off of that, I guess.* I mean, I don't know if Mr. Carman [(the deputy prosecutor)] has anything.

THE COURT: I'm going to hear from Mr. Carman, and let's do this, sir. *It sounds like you're comfortable for your opening in relying on your materials.* You might want to say something more after you hear what Mr. Carman has to say?

MR. NIELSEN: Yes, Your Honor.

THE COURT: Let's do it that way. Mr. Carman, you get ten minutes, and then we'll see if Mr. Nielsen would like to say something in response.

(Emphasis added.) Nielsen clearly sought to rest on his written arguments as presented in his motion. Despite its express acknowledgment of Nielsen's request in that regard, the trial court failed to rule on this aspect of his motion.

After extensive discussion of curtilage and whether the vehicular residences on the property were captured within the body of case law on that topic, but without testimony about the sort of vehicles at Great Dane Lane that would establish a sufficient evidentiary record for such a determination or analysis of whether curtilage can even apply to those sorts of vehicles used as residential shelters under case law, the court simply held,

From the [c]ourt's perspective, this is an interesting question. The [c]ourt appreciated the effort and the attention that went into it. But the [c]ourt is denying the motion to suppress. In technical lingo, there was no search here. Consequently, there did not need to be a warrant.

However, this only addressed Nielsen's assertion in his motion that the contact and resulting arrest on January 25 was both an unlawful search and seizure. The judge failed to enter *any* ruling as to the propriety of the January 23 stop or recognize the legal relationship between the two incidents. Strategically, it makes sense that the State would have avoided emphasizing improperly obtained

information that led to an arrest on multiple felony charges by failing to examine Walker further about the source of the information he obtained about Nielsen and the Great Dane Lane address and failed to secure Engert's appearance for testimony at the hearing. There is no reason, however, for the court to neglect to rule on one of the issues central to Nielsen's motion. The court did tell Nielsen he could object to the findings and conclusion it ordered the State to prepare, but only if he "didn't agree that the findings and conclusions accurately reflect what the court has ruled."

At oral argument on appeal, the State averred that it that it did not need to prove an exception to the exclusionary rule, asserting that Walker's plain-view discovery of Nielsen at the property on Great Dane Lane did not require alternative justification to be lawful.[16] But, again, this misses the point; the State had a burden to prove that the investigatory stop at Great Dane Lane on January 25 was not tainted by the illegality of Engert's stop two days earlier. In fact, again at oral argument before this court, the State acknowledge that law enforcement, "at least in part," knew that Nielsen was "affiliated" with the property on Great Dane Lane "because of Engert's stop" on January 23.[17]

---

[16] Wash. Ct. of Appeals oral arg., *supra*, at 11 min., 9 sec.
[17] The following exchange occurred between this panel and the State:
    COURT: Why was [the deputy] going to that property? Why would he go to that property?
    STATE: Because that property was known to law enforcement to be affiliated with Mr. Nielsen.
    COURT: Because?
    STATE: In—*at least in part because of the stop that happened with Deputy Engert*.
*Id.* at 11 min., 45 sec. (emphasis added).

Because of the manner by which Nielsen structured his motion to suppress and the clear evidentiary link he identified between the two incidents, the State was required to show attenuation or independent source as to the ICSO's association between Nielsen and the Great Dane Lane address such that the exclusionary rule did not mandate suppression. *See Mayfield*, 192 Wn.2d at 898 (attenuation requires "an unforeseeable intervening act genuinely severs the causal connection between official misconduct and the discovery of evidence" for unlawfully obtained evidence to escape suppression); *Gaines*, 154 Wn.2d at 718 ("independent source" requires evidence be "obtained pursuant to a valid warrant or other lawful means" to escape suppression). Here, the State failed to even attempt to prove, and therefore it may not avail itself of, either exception. To be clear, Engert's information connecting Nielsen to the stolen Cavalier was untainted evidence that resulted from the initial stop based on the mistake in reading the license plate and was properly conveyed to the ICSO deputies. For example, if Engert had simply observed and recognized Nielsen driving the Cavalier on January 23 and not initiated a traffic stop, he would have been free to pass that information along to other officers. The tainted evidence is *the fact of an association between Nielsen and the Great Dane Lane address* that was obtained as a result of the unlawful traffic stop and relied on by the deputies who ultimately arrived at that location to look for him there, observed him in the Cavalier, and effectuated his arrest.

The trial court erred when it denied Nielsen's motion as it misapplied the controlling law and failed to hold the State to its evidentiary burden in such a

challenge. It separately erred in failing to rule at all on the propriety of the January 23 stop despite Nielsen's inclusion of that matter in his written motion and appendices. While the court was improperly focused on the novel question of curtilage, it failed to reckon with the evidentiary connection between the two law enforcement contacts Nielsen plainly challenged. Our de novo review of the findings of fact and legal conclusions establishes that the trial court's ruling was an abuse of discretion as it rests on an "erroneous determination of facts" in that certain necessary facts were absent and others that were found lacked a foundation in substantial evidence, and therefore, the legal conclusions reflect both misinterpretation and misapplication of the law.[18] *Hill*, 123 Wn.2d at 647.

We reverse and remand for suppression consistent with this opinion.

WE CONCUR:

_Díaz, J._                        _Mann, J._

---

[18] Because our decision on this assignment of error is dispositive, we need not reach Nielsen's additional challenge to the denial of his motion to suppress premised on his claim that the ICSO deputies' entry onto the Great Dane Lane on January 25 was also subject to the warrant requirement and separately a violation of his rights under the federal and state constitutions.

Nor do we consider his argument in the alternative that if we conclude that the trial court did not err in denying his motion to suppress, he should be permitted to withdraw his plea as involuntarily made.